PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDITH HERNANDEZ-MENDEZ,

*Defendant-Appellant.*

No. 09-4511

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:08-cr-00481-DKC-1)

Argued: September 24, 2010

Decided: November 29, 2010

Before WILKINSON, AGEE, and DAVIS, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

## COUNSEL

**ARGUED:** Joanna Beth Silver, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Adam Kenneth Ake, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore,

Maryland, Lauren E. Case, Staff Attorney, Rebecca Haciski, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Stuart A. Berman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

## OPINION

DAVIS, Circuit Judge:

Edith Hernandez-Mendez was indicted for possession of a firearm by an alien in violation of 18 U.S.C. § 922(g)(5)(A) and possession of a firearm in a school zone in violation of 18 U.S.C. § 922(q). Following the district court's denial of her motions to suppress, Hernandez-Mendez submitted to a bench trial on stipulated facts in order to preserve for appellate review the constitutional issues raised in her suppression motions. After finding Hernandez-Mendez guilty on both counts, the district court imposed a sentence of time served. On appeal, Hernandez-Mendez contends that the district court erred in (1) finding that police officers had reasonable suspicion to detain her and (2) failing to suppress the fruits of the police search of her purse given the officer's intent to search for identification documents. We reject Hernandez-Mendez's contentions and affirm.

I

This court reviews the legal conclusions of a district court's ruling on a motion to suppress *de novo* and the underlying findings of fact for clear error. *United States v. Banks*, 482 F.3d 733, 738 (4th Cir. 2007); *United States v. Sprinkle*, 106 F.3d 613, 616-17 (4th Cir. 1998). Where the district court denied defendant's motion to suppress, we construe the evidence in the light most favorable to the Government, the pre-

vailing party below. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008).

On September 18, 2008, members of the Montgomery County Police Department ("MCPD") gang unit, including Officer Richard Webster and Officer Casey Doherty, set up surveillance of the area around Montgomery Blair High School ("BHS") on University Boulevard in Silver Spring, Maryland. The gang unit chose to deploy near the school in response to a stabbing incident that had taken place the previous day in a Giant Food parking lot located approximately two miles from the high school. Officer Webster knew that the stabbing victim was a member of the Vatos Locos, a Latino gang. Additionally, witnesses told police that members of other Latino gangs, including the Little Vatos Locos ("LVL") and the Latin Locos, had been present at the altercation. One witness to the incident came to the police station and reported that she had seen a leader of the Latin Locos waving a gun around. Because BHS had a history of gang-related incidents and because some LVL and Latin Locos members were students at BHS, the MCPD gang unit decided to set up surveillance in the school's vicinity the following day in the hope of forestalling any attempt at retaliation for the stabbing.

While stationed outside the school, the officers observed four Hispanic youths standing under a tree across the street from the school. Another group of three Hispanic males and one Hispanic female, later identified as Hernandez-Mendez, soon joined the group under the tree, arriving from the direction of the Woodmoor neighborhood north of the high school. Police observed that the males stood in a group around a young male with a red shirt and pony tail, who appeared to be conducting a discussion or meeting. Occasionally, one of the males would turn to look toward the front of the school.

Though Hernandez-Mendez stood somewhat apart from the rest of the group, one of the males soon went over and spoke

to her, after which Hernandez-Mendez began walking back toward the Woodmoor neighborhood from where she had recently come. Officer Casey Doherty was directed to locate her and keep her in view. Doherty located Hernandez-Mendez sitting under a tree, out of sight of the males.

Just before the school day ended, Officer Webster called for uniformed officers in marked cars to make contact with the group of males. When the marked car arrived, the males split up, three walking toward BHS and three walking north toward Woodmoor. The male in the red shirt took off "at a dead sprint." J.A. 89. Consequently, Officer Webster decided to stop everyone in the group. The males were detained, frisked for weapons, and told to sit on the curb.

Officer Webster requested that Officer Doherty detain Hernandez-Mendez; Doherty approached her, showed his badge, and requested that she sit on the curb. She complied. Officer Doherty then escorted Hernandez-Mendez back to where the other officers had detained the males, advising Officer Webster that he had checked neither Hernandez-Mendez's person nor her purse.

Officer Webster asked Hernandez-Mendez for her name, which she provided. In response to Officer Webster's asking whether she knew the male in the red shirt who had run off, Hernandez-Mendez replied that she did not know "anybody." J.A. 95. Officer Webster then asked Hernandez-Mendez for identification. In addition to her purse, Hernandez-Mendez was holding a wallet in her hand, from which she removed a credit card in the name of Hernandez. Officer Webster requested further identification and asked to look in the wallet. Hernandez-Mendez handed Officer Webster the wallet, in which he found several other credit cards in the same name and a checkbook, but no photo identification.

Officer Webster then asked Hernandez-Mendez if she had photo identification in her purse. As he asked the question, he

reached out to take possession of the purse; Hernandez-Mendez simultaneously said "no" and pulled away. Immediately upon touching the exterior of the purse, Officer Webster felt a solid, heavy object that he recognized to be the barrel of a semiautomatic pistol. At this point, Officer Webster retrieved and opened the purse and found a Smith & Wesson 9mm semiautomatic pistol with unchambered ammunition. He then handcuffed and arrested Hernandez-Mendez and performed a full search of the purse, recovering her Montgomery County public school photo ID and her passport.

In a careful and thorough memorandum opinion issued after the evidentiary hearing (followed by further briefing), the district court found that the police officers had reasonable suspicion to stop and frisk Hernandez-Mendez and denied her motion to suppress the weapon seized from her purse. Following a bench trial, the district court found Hernandez-Mendez guilty of possession of a firearm by an alien in violation of 18 U.S.C. § 922(g)(5)(A) and guilty of possession of a firearm in a school zone in violation of 18 U.S.C. § 922(q). This timely appeal followed.

II

For more than forty years, the law has sanctioned a brief, investigatory stop of a person "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). An "inchoate and unparticularized suspicion or 'hunch'" is not a permissible basis for a *Terry* stop. *Id.* at 27; *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Though the facts need not give rise to probable cause, the officer must be able to articulate an objectively reasonable suspicion of criminal activity. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008); *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997).

Courts assess reasonable suspicion by examining the totality of the circumstances in order to determine whether officers had a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also Arvizu*, 534 U.S. at 273; *Sprinkle*, 106 F.3d at 618. The reasonable suspicion inquiry is fact-intensive, but individual facts and observations cannot be evaluated in isolation from each other. *See Arvizu*, 534 U.S. at 274-75 (finding that, even if the individual facts of a case may be susceptible to innocent explanation, they may be considered collectively to warrant a *Terry* stop). Moreover, the Supreme Court has recognized that this inquiry "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273 (quoting *Cortez*, 449 U.S. at 418). In light of this emphasis on officer experience, this court has stressed the importance of giving "'due weight' to the factual inferences drawn by police officers as they investigate crime." *McCoy*, 513 F.3d at 411 (internal citations omitted); *see also United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004).

Here, the parties agree that Hernandez-Mendez was seized when Officer Doherty asked her to sit on the curb at the direction of Officer Webster. Officer Webster relied on his knowledge of Hispanic gangs in the area, his experience responding to gang-related incidents at BHS, and his observations during the surveillance to find reasonable suspicion to stop the group of eight young Hispanic people gathered across from the school that afternoon.

Hernandez-Mendez contends that the objective facts known to the officers, which she does not dispute, are too tenuous to support a finding of reasonable suspicion. She attempts to distinguish this case from others where courts have upheld the reasonableness of a *Terry* detention, relying on two primary arguments. First, she contends that here, unlike many of those

cases in which courts have upheld the reasonableness of a *Terry* stop, her detention did not take place in a high-crime area or among known criminals. Her argument mistakenly relies on these factors, however, and fails to account for the broader context, which includes officer knowledge and experience. Second, Hernandez-Mendez contends that reasonable suspicion was not sufficiently individualized with respect to her. This argument also fails in light of her actions connecting her to the group of males.

## A

First, Hernandez-Mendez argues that there was not reasonable suspicion to support her detention because she neither associated with known criminals nor lingered in a high-crime area. Though we have emphasized that neither of these factors is dispositive, in some cases, we have examined both as part of the totality of the circumstances. *See, e.g.*, *Sprinkle*, 106 F.3d at 617 (finding that officer knowledge of prior criminal activity may be coupled with other factors to create reasonable suspicion); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (noting that an area's propensity toward criminal activity may be considered as one factor); *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) (same).

Hernandez-Mendez presses us to compare the facts in her case with those in *Sprinkle*, where the court found reasonable suspicion lacking when the defendant was stopped after huddling in a car with a known drug offender in a high drug-crime area. 106 F.3d at 617-19. Hernandez-Mendez argues that her actions were even less suspicious, as she was merely observed in the company of *suspected* gang members. Moreover, she contends that the area around BHS had a crime rate below the national average in nearly every category.[1] She urges us to find significance in the weakness of these factors

---

[1] Whether the vicinity of BHS constitutes a "high-crime area" is contested by the parties.

in her case. However, Hernandez-Mendez's emphasis on these factors is misplaced.[2] Instead, reasonable suspicion in this case is justified by the officer's articulation of objective facts which provided information probative of a likelihood of criminal activity. Moreover, he obtained much of the information through his own observations, which, when coupled with his accumulated experience and relevant background knowledge, formed the basis for a reasonable suspicion that Hernandez-Mendez was engaged in (or was about to become engaged in) criminal activity.

In *McCoy*, we credited an officer's finding of reasonable suspicion based on his experience and familiarity with habits and patterns of local drug traffickers. 513 F.3d at 414-15. In that case, the officer, who had years of experience on the vice narcotics unit, knew from experience that a large number of drug transactions in the county took place in grocery store parking lots and followed a fairly similar pattern. *Id.* at 407. Thus, he found it suspicious when he observed the defendant in a Safeway parking lot, sitting in his car, then driving to a Food Lion parking lot, where he got into a truck cab. *Id.* at 408. Similarly, in *Cortez*, the Supreme Court found it was reasonable for officers to infer that criminal activity might be afoot based on observations that demonstrated a "particular pattern of operations." 449 U.S. at 419 ("By piecing together

---

[2]Indeed, the Government's reliance on the presence of these factors is also largely misplaced. To be sure, the "high-crime-area" factor has become increasingly prominent in this court's stop-and-frisk jurisprudence. *See, e.g.*, *United States v. Black*, 525 F.3d 359, 367 (4th Cir. 2008) (Gregory, J., dissenting) ("the majority is left with a de facto rule that allows police to search and seize anyone who finds himself in a 'high-crime area'"); *Mayo*, 361 F.3d at 805-06 (noting that whether the stop occurred in a high-crime area is a factor traditionally used in assessing the totality of the circumstances). Just as the criminal propensity of residents does not, in and of itself, *establish* reasonable suspicion, this propensity is not, nor should it be, a *prerequisite* for finding reasonable suspicion. Here, the district court did not rely on these factors in denying the motion to suppress, and we find the totality of the circumstances do not require us to address them.

the information at their disposal, the officers tentatively con-cluded that there was a reasonable likelihood" that a vehicle would attempt to pick up a group of unlawful aliens on a par-ticular night.).

Here, Officer Webster knew that several Hispanic gangs were represented at BHS, had responded to a half dozen gang-related incidents at the school personally, and was aware that a stabbing incident involving some of the gangs active at BHS had taken place the night before. His concern that the previ-ous night's stabbing might result in retaliation near the school led him to set up a surveillance team the following afternoon.

The gathering of seven Hispanic males and one Hispanic female across the street from the high school, shortly before the end of the school day, the day following a gang-related stabbing, alerted him to the possibility that the group might be planning some sort of retaliatory action.[3] Officer Webster noted that, while some in the group looked to be school-age, several looked to be older. The males, who were gathered around a male wearing a red shirt, appeared to be having a meeting or discussion, while occasionally looking toward the school's entrance.

Hernandez-Mendez stood apart from the group of males and did not appear to participate in their discussion. After sev-eral minutes, however, Officer Webster observed that a male in a blue shirt went over and spoke to her, after which she began to walk back in the direction from which she had come. Officer Webster directed Officer Doherty to follow Hernandez-Mendez, who located her at rest part way up the

---

[3]At oral argument, counsel for Hernandez-Mendez seemed to suggest that the officers' identification of the group outside the high school as per-sons of Hispanic origin constituted impermissible racial or ethnic profil-ing. The district court found no such indication, and we can discern no support in the record for such a contention. Instead, our decision here rests firmly on the reasonable inferences drawn by trained officers based on their actual knowledge, experience, and observations.

block. Officer Webster ordered Hernandez-Mendez to be followed in part because of her connection with the males. In addition to his observations of Hernandez-Mendez, he was motivated by his knowledge that female gang members were often responsible for holding weapons or other contraband in order to minimize the potential for discovery by police, who were perceived to be more likely to frisk male gang members. The district court credited this expertise, noting that Hernandez-Mendez's case, where the males were frisked far sooner than she was, supported the perception.

Close to the end of the school day, Officer Webster called in marked police cars and uniformed officers to approach the group. On seeing the marked cars, the group of males split up, moving in several directions, with the male in the red shirt running off quickly and escaping detention. It was at this point that Officer Webster decided to stop everyone in the group and directed Officer Doherty to detain Hernandez-Mendez.[4] Officer Webster's observations that afternoon, in addition to his knowledge of and experience in responding to gang incidents in the immediate area, provided reasonable suspicion that the group was involved in (or was about to become involved in) criminal activity, and he acted reasonably in drawing the inference that the group was planning to retaliate against rival gang members leaving BHS. In light of these reasonable inferences, Hernandez-Mendez's arguments regarding the absence of known criminals and lack of criminal propensity of the area are not persuasive.

## B

Hernandez-Mendez also argues that, even if we credit Officer Webster's experience and knowledge, he lacked individu-

---

[4]The knowledge of the officer who ordered the stop may be imputed to the officer who conducted the stop. *See, e.g.*, *United States v. Hensley*, 469 U.S. 221, 232-33 (1985); *United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996).

alized suspicion with respect to her. In particular, she seems to contend that the Government relies solely on the actions and behavior of the males in the group to justify stopping her. Manifestly, this is not so.

Hernandez-Mendez urges us to find the facts here similar to those in *United States v. Patterson,* 340 F.3d 368 (6th Cir. 2003). In that case, police stopped a group of males gathered near a street corner several hours after receiving an anonymous tip about drug activity on that corner. *Id.* at 370. Police had seen one of the group (not Patterson) throw something in the bushes as police approached. *Id.* Police attempted to justify the stop of Patterson in part on that act, but the court rejected that evidence as inapplicable to Patterson. *Id.* at 372 ("In order to search Patterson, the officers only could factor in Patterson's actions and the circumstances surrounding him alone in order to constitute reasonable suspicion."). Hernandez-Mendez argues that here the police attempt to justify stopping her by relying on the acts of the males in the group and the evasive behavior of the male in the red shirt, in particular. Reliance on the acts of others, Hernandez-Mendez argues, cannot contribute to a finding of individualized suspicion. This argument misses the mark.

Here, the course of the law enforcement investigation, coupled with the telling background knowledge of the police who were present at the scene, yielded factual information rising to the level of reasonable suspicion to detain all of the members of the group: the seven males as well as Hernandez-Mendez. In light of this collective stop, the relevant question is whether the officers reasonably inferred that Hernandez-Mendez was potentially a knowing and willing participant in whatever incipient criminal activity the group of males gathered across from the school might have been contemplating. If such an inference was reasonable, then the police were justified in detaining her when they stopped the others. As the district court found, the facts (which Hernandez-Mendez does not dispute) suggest that she was such a likely participant.

Along with three Hispanic males, Hernandez-Mendez joined the group of four Hispanic males gathered across the street from the school near the end of the school day. Though she stood slightly apart from the rest of the group, she spoke briefly with one of the males with whom she had arrived. Immediately following that conversation, Hernandez-Mendez walked back in the direction from which she had just come. Notably, she did not leave the area; rather, she stopped to sit under a tree further up the street.

It is true, as she emphasizes, Hernandez-Mendez had walked away from the group and was out of their sight at the time of the stop. However, she had arrived in the area with some of the males in the group, she spoke to one of them, and, when she walked away, she remained in the vicinity. Based on his knowledge and experience, Officer Webster had reason to be suspicious of the group of Hispanic youths gathered across from the high school near the end of the school day on the day after a Hispanic gang-related stabbing. In light of her actions, he reasonably concluded that Hernandez-Mendez was more than casually connected to the group of males that he reasonably suspected was preparing for retaliation, and the decision to stop her was justified based on that reasonable suspicion.

III

Hernandez-Mendez further contends that, even if there was reasonable suspicion for her detention, we should nonetheless conclude that the frisk of her purse was not supported by objective facts because the officer's purpose exceeded the bounds of a permissible *Terry* frisk. This argument fails, however, because, as the district court correctly concluded, courts assess the reasonableness of a frisk using an objective standard and not an officer's subjective intent. Here, the objective circumstances justified a frisk of Hernandez-Mendez for weapons.

A frisk for weapons is permissible when an officer reasonably believes that the person being stopped "may be armed and presently dangerous." *Terry*, 392 U.S. at 24; *Mayo*, 361 F.3d at 805. If a *Terry* frisk exceeds the bounds of a protective pat down for weapons, it is no longer permissible, and its fruits should be suppressed. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.").

Officer Webster asked to look inside Hernandez-Mendez's purse and then reached for it with the intent of locating photographic identification. *Terry* does not permit this kind of search for evidence as part of a protective pat down. *See Adams*, 407 U.S. at 146. However, the subjective intent of the officer is not the standard by which courts have judged the reasonableness of a frisk.

Rather, courts have relied on a standard of objective reasonableness for assessing whether a frisk is justified. This objective standard is applied "without regard to the underlying intent or motivation of the officers involved." *Scott v. United States*, 436 U.S. 128, 138 (1978) (finding officer's subjective intent did not invalidate objectively reasonable action); *see also Branch*, 537 F.3d at 337 ("if sufficient objective evidence exists to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent"); *United States v. Swann*, 149 F.3d 271, 275 (4th Cir. 1998) ("Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure.") (internal citations omitted); 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.6(a) (4th ed. 2004) (noting that, if the facts were sufficient to warrant a protective pat down, then an officer's thoughts or motivations do not invalidate the frisk).

In the instant case, the objective facts justifying Hernandez-Mendez's detention and those that emerged after she had been

detained provide reasonable suspicion justifying a frisk. The officers were aware of the potential for some sort of gang retaliation near BHS on the afternoon of September 18, 2008. The previous day, a known Hispanic gang member was stabbed with a knife in an incident that reportedly involved Hispanic gangs that were active at BHS. One witness reported seeing a gang leader waving a gun around during the stabbing incident. In light of these reports, Officer Webster had reason to suspect the presence of weapons among the group of young, Hispanic individuals that he reasonably believed were organizing a retaliatory attack across the street from the school that afternoon.

Hernandez-Mendez's conversation with one of the males in the group and the fact that she stood nearby during their discussion led Officer Webster to believe that she was part of their group, and he ordered her detained with the others. All seven males were frisked immediately, though Officer Doherty did not immediately frisk Hernandez-Mendez when he stopped her.

Officer Doherty escorted Hernandez-Mendez back to the area where other officers had detained the males and informed Officer Webster that neither Hernandez-Mendez nor her purse had been checked. Hernandez-Mendez's conduct after the initial stop served to heighten rather than mitigate Officer Webster's suspicions.

When Officer Webster asked Hernandez-Mendez if she knew the male in the red shirt who ran off, she responded that she did not know "anybody," despite the fact that Officer Webster had observed her in the company of three of the males as they approached the location of the incident and later speaking separately to one of the males in the group. Hernandez-Mendez also told Officer Webster that she had just come from the doctor, pointing to the band-aid on her arm, when, in fact, Officer Webster had observed her standing near the group of males prior to her detention.

Officer Webster sought identification from Hernandez-Mendez. She had her wallet in her lap, outside her purse, and she first removed a credit card with her name on it. When pressed for a photo identification, Hernandez-Mendez handed over her wallet, in which Officer Webster found several other credit cards, but no photo identification. Although the facts surrounding the stop itself may well have been sufficient on their own to justify a frisk of Hernandez-Mendez, these facts demonstrating her subsequent evasiveness contribute to the objective reasonableness of a frisk for weapons. *See, e.g.*, *Mayo*, 361 F.3d at 807-08.

It should be noted that the distinction between a pat down of Hernandez-Mendez's clothing and a pat down of her purse is not meaningful in this particular context. At the time she was detained, Hernandez-Mendez was wearing a tank top shirt and shorts and was carrying a purse. Given her clothing, there were few places that she could conceal a weapon other than in her purse, making it objectively reasonable to frisk her purse in addition to her person. *See, e.g.*, *United States v. Williams*, 962 F.2d 1218, 1223-24 (6th Cir. 1992) (finding frisk of purse "a reasonable self-protective measure");4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.6(e) (4th ed. 2004) (noting that many courts have upheld the reasonableness of police protective searches of items carried by suspect at the time of a *Terry* stop).

During a permissible frisk, if a police officer "feels an object whose contour or mass makes its identity immediately apparent" as contraband, it may be lawfully seized. *Minnesota v. Dickerson*, 508 U.S. at 375-76 ("plain feel" doctrine); *see also Swann*, 149 F.3d at 276 (finding seizure of several credit cards hidden in suspect's sock justified when reasonable officer could have believed item was a weapon, e.g., a box cutter).

After failing to find photo identification in Hernandez-Mendez's wallet, Officer Webster asked if she had photo

identification in the purse she was still carrying, while reaching out to grab it. Hernandez-Mendez said "no" and pulled away at the same time that Officer Webster felt what he recognized as the barrel of a pistol. Officer Webster immediately felt the weapon when he touched the purse, meaning that the impermissible search for evidence (photo identification) occurred at the same time as what both we and the district court find was a proper frisk of her purse. As the district court correctly stated:

> Fortuitously, Officer Webster's effort to "search" the purse for identification began with the equivalent of a pat down of the purse when he reached for it. He immediately felt an object that he recognized to be a firearm, which then justified looking inside and seizing the weapon. J.A. 215.

In light of the facts supporting reasonable suspicion to detain Hernandez-Mendez and her evasive answers after she had been stopped, a reasonable officer generally, and Officer Webster in particular, would have had reasonable suspicion that she possessed a weapon, thus justifying a frisk of her purse. Because the objective circumstances would have justified a frisk, Officer Webster's impermissible subjective intent does not require suppression of the seized items.

IV

The district court did not err when it concluded that Officer Webster's stop and frisk of Hernandez-Mendez was objectively reasonable and in denying the motion to suppress the fruits of the search. Accordingly, the judgment is

*AFFIRMED*.