Reversed and vacated by published opinion. Judge HARRIS wrote the opinion, in which Senior Judge DAVIS joined. Judge NIEMEYER wrote a dissenting opinion.
HARRIS, Circuit Judge:
On an afternoon in 2014, the Ranson, West Virginia police department received an anonymous tip that a black man had loaded a gun in a 7-Eleven parking lot and then concealed it in his pocket before leaving in a car. A few minutes later, the police stopped a car matching the description they had been given, citing a traffic violation. Shaquille Montel Robinson, a black man, was a passenger in the car. After Robinson exited the vehicle at police request, an officer frisked Robinson and discovered a firearm in the pocket of Robinson’s pants.
Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police may conduct a limited pat-down for weapons when there is reasonable suspicion that a suspect is both armed and dangerous. “Armed” is not a problem in this case: Assuming the credibility of the anonymous tip, which we may for purposes *204 of this appeal, the police had reason to believe that Robinson was armed when they stopped him. But “dangerous” is more difficult, and what makes it difficult is that West Virginia law authorizes citizens to arm themselves with concealed guns. Because the carrying of a concealed firearm is not itself illegal in West Virginia, and because the circumstances did not otherwise provide an objective basis for inferring danger, we must conclude that the officer who frisked Robinson lacked reasonable suspicion that Robinson was not only armed but also dangerous. Accordingly, we reverse the district court decision denying Robinson’s motion to suppress the evidence uncovered by this unlawful search.
I.
A.
At 3:55 p.m. on March 24, 2014, the Ranson police department forwarded an anonymous call to Officer Crystal Tharp. At a hearing conducted by the magistrate judge, Tharp testified that the caller “advised that he had witnessed a black male in a bluish greenish Toyota Camry load a firearm, conceal it in his pocket, and there was a white female driver.” J.A. 43. The caller indicated that the car had just left the location, which he identified as the parking lot of a 7-Eleven on North Mildred Street. Immediately adjacent to that 7-Eleven is the Apple Tree Gardens apartment complex, regarded by the officers in this case as the highest-crime area in Ran-son.
The caller advised that the Camry had headed south on North Mildred Street. Two officers, Captain Robbie Roberts and Officer Kendall Hudson, separately left the station to find the car. Officer Hudson spotted a car matching the description traveling on North Mildred Street, and noticed that the two occupants were not wearing seatbelts, a traffic violation under West Virginia law. Relying on the seat-belt violation, he pulled over the car, approximately two to three minutes after the anonymous call had been received and roughly three-quarters of a mile from the 7-Eleven.
Officer Hudson approached the driver’s side of the car with his weapon drawn and asked the female driver for her license and registration. She complied. At the hearing before the magistrate judge, Hudson testified that he also initially asked Robinson for his identification, but then realized that asking him to reach into his pocket was “probably not a good idea” because “[tjhis guy might have a gun.” J.A. 66. Instead, Hudson asked Robinson to step out of the car.
At this point, Captain Roberts had arrived at the scene as backup. Roberts testified that he approached Robinson and opened the passenger-side door. As Robinson was exiting the car, Roberts asked Robinson if he had any weapons. In response, Roberts testified, Robinson gave a “weird look.” J.A. 88. Roberts ordered Robinson to put his hands on top of the car and began to frisk him for weapons, discovering a firearm in Robinson’s pants pocket.
Captain Roberts whispered “gun” to Officer Hudson, and Hudson handcuffed Robinson and ordered him to sit on the sidewalk. According to the officers’ testimony, Robinson was cooperative throughout his encounter with the police, and made no furtive gestures or movements suggesting that he intended to reach for a weapon. After frisking him, however, Roberts recognized Robinson from prior criminal proceedings and confirmed that Robinson was a convicted felon.
*205 B.
A grand jury in the Northern District of West Virginia indicted Robinson on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Robinson moved to suppress the' evidence against him — the gun recovered during the traffic stop of March 24 — on the ground that the frisk was unlawful. The district court referred the motion to a magistrate judge for a report and recommendation.
The magistrate judge conducted a hearing, taking testimony from all of the officers involved in the events of March 24: Officer Tharp, Officer Hudson, and Captain Roberts. A fourth officer, Trooper D.R. Walker, testified as to the high level of criminal activity at the Apple Tree Garden apartment complex next to the 7-Eleven at which Robinson had been seen loading his weapon. Following the hearing, the magistrate judge issued a report that recommended granting Robinson’s motion to suppress.
The magistrate judge agreed with the government that the initial stop of the car was justified by the observed seatbelt violation. But the frisk, the magistrate judge concluded, was not supported by a “reasonable belief that [Robinson] [was] armed and presently dangerous,” as required to justify a pat-down for weapons under Terry. J.A. 124(quoting Ybarra v. Illinois, 444 U.S. 85, 86, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). The problem, the magistrate judge explained, was that in light of West Virginia law allowing for both open and concealed carrying of loaded guns, “the content of the tip provided to the police, while reporting the individual was armed, does not contain any information demonstrating that the individual was engaging in any objective or particularized dangerous behavior.” J.A. 136 (emphasis added) (internal quotation marks omitted).
The magistrate judge also considered the facts surrounding the officers’ encounter with Robinson, including the “high-crime” status of the apartment complex next to the 7-Eleven. Based on the officers’ testimony, the magistrate judge concluded that both the car’s driver and Robinson were cooperative throughout, and that Robinson had made no “furtive gestures, movements or inconsistent statements” suggesting nervousness or an intent to reach for a weapon. J.A. 131. Apart from what one officer perceived as a “weird look” — which the magistrate judge deemed a “subjective impression” insufficient to justify a frisk, J.A. 137 — the magistrate judge concluded that the government had failed to “articulate any specific fact, other than [Robinson’s] possession of a firearm in a high crime neighborhood, a legal activity in the state of West Virginia, which would justify the officer’s suspicion that [Robinson] was dangerous.” J.A. 138.
After the government submitted objections, the district court rejected the magistrate judge’s report and recommendation in relevant part and denied the suppression motion. Because it did not conduct a second hearing, the district court relied on the record created before the magistrate judge. And in the district court’s view, a reasonable suspicion that Robinson was armed in a high-crime area, when combined with Robinson’s failure to answer when asked by an officer if he was armed, translated to a reasonable suspicion that Robinson was dangerous.
Robinson conditionally pleaded guilty to being a felon in possession of a firearm, preserving his right to appeal the denial of his suppression motion, and was sentenced to 37 months of incarceration. This timely appeal followed.
II.
In reviewing the denial of a motion to suppress, we examine the district *206 court’s factual findings for clear error and its legal conclusions de novo. United States v. Elston, 479 F.3d 314, 317 (4th Cir.2007). We view the evidence, in the light most favorable to the government, as the prevailing party before the district court. United States v. Black, 707 F.3d 531, 534 (4th Cir.2013).
A.
This case is governed by the familiar two-part standard of Terry v. Ohio, which considered the lawfulness of “stop and frisk” procedures under the Fourth Amendment. 392 U.S. 1, 88 S.Ct. 1868. Under Terry, an officer may conduct a brief investigatory “stop” — including a traffic stop, see Arizona v. Johnson, 555 U.S. 323, 330-32, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)—based on reasonable suspicion of criminal activity, without the need for a warrant or probable cause. Terry, 392 U.S. at 30, 88 S.Ct. 1868; see, e.g., United States v. Holmes, 376 F.3d 270, 275 (4th Cir.2004). But a valid stop does not automatically entitle an officer to conduct a “frisk,” or protective pat-down of outer clothing for weapons. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir.1998) (officer “must have justification for a frisk or a ‘pat-down’ beyond the mere justification for [a] traffic stop”). Rather, because a frisk is a “serious intrusion upon the sanctity of the person,” Terry, 392 U.S. at 17, 88 S.Ct. 1868, it is subject to a separate standard: The police may frisk a person who has been legally stopped only if the officer has a reasonable and articula-ble suspicion that the person is. “armed and presently dangerous to the officer or to others.” Id. at 24, 88 S.Ct. 1868; Holmes, 376 F.3d at 275.
 In deciding whether a frisk is justified, we “examine the ‘totality of the circumstances’ to determine if the officer had a ‘particularized and objective basis’ for believing that the detained suspect might be armed and dangerous.” United States v. George, 732 F.3d 296, 299 (4th Cir.2013) (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). As the district court noted, multiple factors may together create reasonable suspicion that a suspect is armed and dangerous even if none of them would be sufficient taken alone. Id. at 300. The standard is objective, so a frisking officer’s subjective impressions are not relevant to our analysis. Id. at 299; United States v. Hernandez-Mendez, 626 F.3d 203, 212 (4th Cir.2010).
Here, Robinson does not contest the validity of the initial traffic stop by Officer Hudson. Nor could he. As the magistrate judge explained, under Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), approving “pretextual” stops under the Fourth Amendment, evidence of a seatbelt violation justified the stop regardless of whether the officer actually was motivated by the anonymous tip. Accordingly, the only question we must decide is whether the subsequent frisk was lawful — that is, whether the officers had reasonable suspi-. cion that Robinson was “armed and dangerous.” And our inquiry is narrower still because Robinson does not dispute reasonable suspicion that he was “armed,” choosing not to contest the reliability of the anonymous tip to the police.[1] All that remains for us to decide is whether there was reasonable suspicion that Robinson was “dangerous.”[2] For the reasons set out below, we conclude that there was not.
*207 B.
All parties agree that the anonymous tip to the police, giving rise to a reasonable suspicion that Robinson was carrying a loaded and concealed firearm, is critical to the government’s case on dangerousness. Accordingly, we start with the' tip, and consider first whether reasonable suspicion that Robinson was armed, in and of itself, generated reasonable suspicion of dangerousness sufficient to justify a Terry frisk.
In a different time or jurisdiction, it might well have. If carrying a concealed firearm were prohibited by local law, then a suspect concealing a gun in his pocket by definition would be presently engaged in criminal activity involving a deadly weapon. And where local law tightly regulates the concealed carry of firearms, permitting it only in rare cases, then a concealed gun may remain a strong indication of criminal activity. In those circumstances, there is precious little space between “armed” and “dangerous,” and a police officer may be justified in conducting a Terry frisk on reasonable suspicion that a suspect is concealing a gun. Indeed, Terry itself, approving a protective frisk where an officer had reason to believe a robbery suspect was armed with a concealed handgun, see 392 U.S. at 24, 88 S.Ct. 1868, was decided at a time when handgun possession was illegal. See Northrup v. City of Toledo Police Dep’t, 785 F.3d 1128, 1131 (6th Cir.2015) (Sutton, J.).[3]
But times have changed, and we decide this case against a different legal background. As Officer Tharp testified, none of the conduct reported in the anonymous tip she received — that a man had loaded a gun in the parking lot of a 7-Eleven and then concealed it in his pocket before leaving in a car — is currently illegal under West Virginia law. On the contrary, in West Virginia it is legal to carry a gun in public, see W. Va.Code § 61-7-3; United States v. Perkins, 363 F.3d 317, 327 (4th Cir.2004), and it is legal to carry a concealed firearm with a permit, see W. Va. *208 Code §§ 61-7-3, 61-7-4. And permits are relatively easy to obtain; West Virginia is a “shall issue” state, in which the sheriff must issue a license to any applicant who submits a complete and accurate application, pays the $75 fee, and certifies that he or she meets certain basic requirements, such as age and training. Id. § 61-7-4. Today in West Virginia, in other words, there is no reason to think that public gun possession is unusual, or that a person carrying or concealing a weapon during a traffic stop is anything but a law-abiding citizen who poses no danger to the authorities.
“[A]s public possession and display of firearms become lawful under more circumstances, Fourth Amendment jurisprudence and police practices must adapt.” United States v. Williams, 731 F.3d 678, 691 (7th Cir.2013) (Hamilton, J., concurring). Within the last decade, federal constitutional law has recognized new Second Amendment protections for individual possession of firearms, see McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010); District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and state law has followed, providing expanded rights to carry guns in public, see Williams, 731 F.3d at 691. And as conduct once the province of law-breakers becomes increasingly commonplace, courts must reevaluate what counts as suspicious or dangerous behavior under Terry when it comes to public possession of guns. See Northrup, 785 F.3d at 1132-33.
We have recognized as much already, holding in United States v. Black that when a state authorizes the open display of firearms, public possession of a gun is no longer suspicious in a way that would authorize a Terry stop. 707 F.3d at 539-40. “Permitting such a justification,” we explained, “would eviscerate Fourth Amendment protections for lawfully armed individuals in those states.” Id. at 540. Several of our sister circuits have reached similar conclusions. In Northrup, for instance, the Sixth Circuit held that where state law permits the open carry of firearms, the police are not authorized by Terry to conduct a stop or frisk of a person brandishing a gun in public. 785 F.3d at 1131-33. Likewise, in United States v. Ubiles, 224 F.3d 213, 218 (3d Cir.2000), the Third Circuit invalidated a Terry stop based on the suspicion of gun possession at a street festival because local law permitted public possession of firearms: “For all the officers knew, even assuming the reliability of the tip that [the defendant] possessed a gun, [the defendant] was another celebrant lawfully exercising his right under Virgin Islands law to possess a gun in public.” Id. at 218. And in United States v. Leo, 792 F.3d 742 (7th Cir.2015), the Seventh Circuit quoted approvingly from Judge Hamilton’s concurrence in Williams, id. at 752, and held that in a “concealed-carry” state, the police could neither Terry “frisk” nor search a backpack in a preschool parking lot on the suspicion that it contained a gun, id. at 749-50, 751-52 (rejecting search of backpack in light of “important developments in Second Amendment law together with Wisconsin’s [concealed-carry] gun laws”).
Applying the same reasoning, we conclude that in states like West Virginia, which broadly allow public possession of firearms, reasonable suspicion that a person is armed does not by itself give rise to reasonable suspicion that the person is dangerous for Terry purposes. Where the state legislature has decided that its citizens may be entrusted to carry firearms on public streets, we may not make the contrary assumption that those firearms inherently pose a danger justifying their seizure by law enforcement officers with *209 out consent. Cf. Northrup, 785 F.3d at 1133 (police have “no authority to disregard” the decision of the legislature to allow public possession of guns by using such possession to justify Terry stops and frisks). Nor will we adopt a rule that “would effectively eliminate Fourth Amendment protections for lawfully armed persons,” id. at 1132 (citation and quotation marks omitted), authorizing a personally intrusive frisk whenever a citizen stopped by the police is exercising the constitutional right to bear arms. See id.; Black, 707 F.3d at 540.
Allowing police officers making stops to frisk anyone who is thought to be armed, in a state where the carrying of guns is widely permitted, would “ereate[] a serious and recurring threat to the privacy of countless individuals,” Arizona v. Gant, 556 U.S. 332, 345, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (holding that police may not search a car “whenever an individual is caught committing a traffic offense”). It also would “giv[e] police officers unbridled discretion” to decide which of those legally armed citizens to target for frisks, implicating concerns about abuse of police discretion that are central to the Fourth Amendment. See id.; Black, 707 F.3d at 541. As Judge Hamilton warned in Williams, once a state legalizes the public possession of firearms, unchecked police discretion to single out anyone carrying a gun gives rise to “the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity.” 731 F.3d at 694.
Those concerns are especially pressing in the context of traffic stops like the one in this case. Under Whren, on which the government relies here, the police may conduct a pretextual stop for a routine traffic violation — like Robinson’s seatbelt violation — when their real motive is to investigate some other unsupported hunch. 517 U.S. at 813, 116 S.Ct. 1769. And under Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), reasonable suspicion that the subject of such a traffic stop is armed and dangerous may authorize not only a frisk of the suspect’s person but also a “frisk” of the passenger compartment of the car. Id. at 1049-50, 103 S.Ct. 3469. So if public possession of a firearm in an open- or concealed-carry state were enough to generate a reasonable suspicion of dangerousness, then pretextual traffic stops would allow police officers to target perfectly law-abiding gun owners for frisks and also limited car searches, at police discretion and on the basis of nothing more than a traffic violation. That is effectively the same result that the Supreme Court found unacceptable in Gant, 556 U.S. at 345, 129 S.Ct. 1710 (forbidding car searches incident to arrest for minor traffic violations), and it is no more acceptable here.
We recognize that in this case, Robinson’s possession of a gun was not in fact legal because Robinson was a convicted felon. But a frisk must be justified on the basis of “what the officers knew before they conducted their search,” see Florida v. J.L., 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (emphasis added), and at the time of the frisk, Captain Roberts had no reason to suspect Robinson of a prior felony conviction. Nor, we have made clear, does the mere chance that a gun may be possessed in violation of some legal restriction satisfy Terry: Where it is lawful to possess a gun, unlawful possession “is not the default status.” Black, 707 F.3d at 540; accord Northrup, 785 F.3d at 1132 (quoting Black, 707 F.3d at 540); Ubiles, 224 F.3d at 217-18. We also rec ognize, of course, the serious concerns for officer safety that underlie the Terry frisk doctrine and may be especially pronounced during traffic stops. See, e.g., Pennsylva *210 nia v. Mimms, 434 U.S. 106, 110-11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (police may order driver out of vehicle during traffic stop to protect officer safety). And we do not doubt that recent legal developments regarding gun possession have made the work of the police more dangerous as well as more difficult. See Williams, 731 F.3d at 694. Several states — though not West Virginia — have responded to this concern with “duty to inform” laws, which require individuals carrying concealed weapons to disclose that fact to the police if they are stopped. See, e.g., Alaska Stat. § 11.61.220; La. Stat. § 40:1379.3; Neb.Rev.Stat. § 69-2440; N.C. Gen.Stat. § 14-415.11; Okla. Stat. tit. 21, § 1290.8.[4] And where the police have reasonable suspicion that a person is armed, that person’s failure to so inform the police, as required by law, may well,give rise to a reasonable suspicion of dangerousness.
But as we have explained, under Supreme Court precedent, a more “generalized risk to officer safety” during traffic stops is not enough to justify the intrusion worked by a frisk. Sakyi, 160 F.3d at 168-69. The Supreme Court has struck a different balance, authorizing a protective frisk only on a “specific, articulable suspicion of danger” in a particular case. Id. at 168. And for the reasons given above, once state law routinely permits the public possession of weapons, the fact that an individual is armed, in and of itself, is not an objective indication of danger. Absent some other basis for suspecting danger — a question to which we turn next — police officers must put their trust in West Virginia’s considered judgment that its citizens may safely carry concealed weapons in public and during traffic stops. See Northrup, 785 F.3d at 1133 (responding to government argument that prohibiting stop and frisk of individual carrying a gun would leave officer with no recourse but to “hope that [the suspect] was not about to start shooting”: “[This] hope ... remains another word for the trust that Ohioans have placed in their State’s approach to gun licensure and gun possession.”).
C.
Because West Virginia authorizes the public carrying of weapons, reasonable suspicion that Robinson was armed did not by itself justify a Terry frisk. But even a lawfully possessed firearm can pose a threat to officer safety, and so we also must consider whether a frisk was authorized in light not only of reasonable suspicion that Robinson was armed but also of the surrounding circumstances. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d, 612 (1972) 9Terry frisk may be conducted on reasonable suspicion that a suspect is “armed and presently dangerous,” regardless of whether “carrying a concealed weapon violate[s] any applicable state law”).[5] The govern *211 ment relies on two additional factors: Robinson’s failure to answer when asked by Captain Roberts if he had a gun, and Robinson’s presence in a high-crime area. We conclude that in the context of this case, neither is probative of dangerousness, and that the totality of the circumstances, taken together, see George, 732 F.3d at 300 (reasonable suspicion depends on totality of the circumstances, taken together), did not authorize the frisk of Robinson.[6]
The government first argues — and the district court agreed — that Robinson’s non-answer when asked by Captain Roberts if he was carrying a gun contributed to reasonable suspicion that Robinson was dangerous. Taking the full context into account, as we must, and in light of both the rapidity with which events unfolded and the fact that Robinson was under no legal obligation to inform the police of his weapon, we think that the government’s contention gives too much significance to Robinson’s failure to tell the officers that he was armed.
According to the officers’ testimony before the magistrate judge, Robinson was cooperative throughout his encounter with the police, and he never made any gesture that they construed as reaching for a weapon. And the magistrate judge found — without dispute by the district court — that Captain Roberts’s inquiry to Robinson came virtually simultaneously with the frisk itself: Roberts “asked [Robinson] if he had any firearms on his person as [Robinson] was exiting the vehicle,” and upon perceiving a. “weird look,” ordered Robinson to place his hands on top of the car and conducted the frisk. J.A. 118. Even construing this evidence in the light most favorable to the government, there was a very limited time window during which Robinson could have responded before the frisk made the question moot, and his failure to interject an answer quickly enough did not provide an objective indication that he was about to abandon his cooperative posture and become dangerous.[7]
That is particularly so given that West Virginia does not appear to require that people carrying firearms inform the police of their guns during traffic or other stops. Where a state has decided that gun owners have the right to carry concealed weapons without so informing the police, it would be inconsistent with that legislative *212 judgment to subject gun owners to frisks because they stand on their rights. Cf. Northrup, 785 F.3d at 1132 (“impropriety” of officer’s demand to see permit for gun being brandished in public is “particularly acute” where state has not only legalized open carry of a firearm but also “does not require gun owners to produce or even carry their licenses for inquiring officers”). Again, we recognize that under a different legal regime, different reasonable inferences could be drawn from a failure to answer an officer’s question about a gun. See supra at 209-10. But in light of West Virginia law, and under all of the circumstances of this case, Robinson’s failure to respond immediately to Captain Roberts’s question does not add appreciably to the reasonable suspicion calculus.
The government also relies on the fact that the relevant conduct in this case — the loading of a gun in a 7-Eleven parking lot and the stop of the car approximately three-quarters of a mile away — happened in or near a “high-crime area.” And the Supreme Court indeed has held that presence in a high-crime area may contribute to a finding of reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Under the circumstances here, however, we conclude that this factor does not lend support to an inference that Robinson was a danger to the police.
As our cases have indicated, the relative significance of a high-crime area, like other reasonable suspicion factors, is context-specific. In some cases, for instance, we have sustained a Terry frisk in part because it occurred in a high-crime area late at night. See, e.g., George, 732 F.3d at 300. In Black, however, we rejeet-ed a position substantially the same as the government’s here: that even if public gun possession alone does not justify a Terry stop where the law permits the open carrying of firearms, gun possession in a high-crime area at night would be sufficient. 707 F.3d at 542.[8]
We think that Black applies here. Whether or not a high-crime environment might make other ambiguous conduct — for instance, fleeing from a police officer, see Wardlow, 528 U.S. at 124, 120 S.Ct. 673-more likely to be criminal or dangerous, we conclude that it sheds no light on the likelihood that an individual’s gun possession poses a danger to the police. Where public gun possession is legal, high-crime areas are precisely the setting in which we should most expect to see law-abiding citizens who present no threat to officers carrying guns; there is more, not less, reason to arm oneself lawfully for self-defense in a high-crime area. Cf. McDonald, 561 U.S. at 790, 130 S.Ct. 3020 (“[T]he Second Amendment right protects the rights of minorities and other residents of high-crime areas.”). Presence in a high-crime area, in other words, is as likely an explanation for innocent and non-dangerous gun possession as it is an indication that gun possession is illegal or dangerous, and it does nothing to help police tell the difference.
As discussed above, in states allowing the public possession of weapons, authorizing a Terry pat-down in connection with a traffic stop whenever there is reasonable suspicion that a person is armed would give the police unchecked discretion in deciding which armed citizens to frisk. Allowing such automatic frisks only in high-crime areas would do nothing to address *213 that concern; instead, it would guarantee that the costs of such intrusions would be borne disproportionately by the racial minorities and less affluent individuals who today are most likely to live and work in neighborhoods classified as high-crime. See Black, 707 F.3d at 542. Given the lack of probative value associated with a high-crime area when it comes to gun possession, there is no justification for adopting such a rule. “The new constitutional and statutory rights for individuals to bear arms at home and in public apply to all,” and “[t]he courts have an obligation to protect those rights” in neighborhoods labeled “bad” as well as “good.” Williams, 731 F.3d at 694.
Again, we recognize that expanded rights to openly carry or conceal guns in public may give rise to genuine safety concerns on the part of police officers, as well as other citizens, who more often will find themselves confronting individuals who may be armed. But where a sovereign state has made the judgment that its citizens may safely arm themselves in public, we cannot presume that public gun possession gives rise to a reasonable suspicion of dangerousness, no matter what the neighborhood. And because the rest of the circumstances surrounding this otherwise unremarkable traffic stop do not add appreciably to the reasonable suspicion calculus, we must conclude that Terry did not authorize the police to conduct a frisk of Robinson. Accordingly, we reverse the decision of the district court denying Robinson’s motion to suppress and vacate Robinson’s conviction and sentence.
III.
For the foregoing reasons the judgment of the district court is

REVERSED AND VACATED.

. Though Robinson addressed the issue in his brief, at oral argument he expressly declined to rely on any challenge to the reliability of . the anonymous tip. Accordingly, for purposes of this appeal, we will assume without deciding that the tip was reliable.

. Our dissenting colleague suggests that we may dispense with this inquiry entirely, be *207 cause when the Supreme Court says "armed and dangerous” what it really means is "armed and thus dangerous” — or, put more simply, "armed.” See post at 216-18. But the government does not dispute that "armed” and “dangerous” are separate and independent conditions of a lawful Terry frisk. See Gov’t Br. at 16-17 (given reasonable suspicion that Robinson was armed, "the dispos-itive issue becomes whether a reasonable prudent ... officer would be warranted in the belief that his safety ... was in danger”). We think that is a wise concession. The Supreme Court for decades has adhered to its conjunctive "armed and dangerous” formulation, giving no indication that "dangerous” may be read out of the equation as an expendable redundancy. Indeed, where the Court has elaborated, it has highlighted the independent role of "dangerousness,” holding in Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), that Terry authorizes a "frisk” of an automobile when a police officer possesses reasonable suspicion "that the suspect is dangerous and the suspect may gain immediate control of weapons,” id. at 1049, 103 S.Ct. 3469. Like other courts applying Terry in jurisdictions that routinely permit the public possession of firearms, we take the Supreme Court at its word: A Terry frisk requires reasonable suspicion that a person is "both armed and a danger to the safety of officers or others.” United States v. Leo, 792 F.3d 742, 748 (7th Cir.2015); see Northrup v. City of Toledo Police Dep’t, 785 F.3d 1128, 1132 (6th Cir.2015) ("Clearly established law required [the officer] to point to evidence that [the subject] may have been armed and dangerous. Yet all he ever saw was that [the subject] was armed — and legally so.”) (emphasis in original) (internal citation and quotation marks omitted).

. Similarly, Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), a per curiam opinion on which the dissent relies, arose from an arrest at a time when local law appears to have strictly limited the public possession of firearms, allowing it only in narrow circumstances. See 1943 Pa. Laws 487; 1972 Pa. Laws 1577.

. Other states — though again, it seems, not West Virginia — require those carrying or concealing firearms to disclose that fact to the police in response to a police question, but not otherwise. See, e.g., Ariz.Rev.Stat. § 13-3112; Ark.Code § 5-73-315; 430 Ill. Comp. Stat. 66/10; S.C.Code § 23-31-215.

. We have no quarrel with the dissent's observation that a gun may be dangerous to a police officer whether or not it is legally possessed. See post at 218-19. Where, for instance, there is not only reasonable suspicion that a person is armed but also reasonable suspicion that he is engaged in a drug offense or some other serious crime, or there are other objective indicia of danger, then a Terry frisk may be justified whatever the legal status of the gun in question, consistent with Adams. See 407 U.S. at 147-48, 92 S.Ct. 1921 (armed subject of frisk suspected of drug offenses, sitting alone in car at 2:15 a.m., and unwilling to cooperate with police). So in the many cases in which the police stop individuals they believe to be armed on reasonable suspicion *211 of an actual crime, there may well be enough to show reasonable suspicion that the suspect is dangerous as well as armed. What makes this case different, however, is that the only "crime” of which the police reasonably suspected Robinson was a seatbelt violation; the government has never argued that there was reasonable suspicion of any other crime, nor that danger to the police may be inferred from a person’s failure to wear a seatbelt.

. The government contends that our totality-of-the-circumstances analysis must take account of the actual reason for the stop— investigation of a tip regarding gun possession — and not the pretextual reason on which the government relies to justify the stop — a seatbelt violation. For the proposition that it can have it both ways under Whren, the government can cite only an unpublished decision from our circuit that does not address the issue directly. Without deciding the question here, we may assume that the government is correct for purposes of this appeal, and we will consider the anonymous tip along with the other circumstances surrounding the traffic stop.

. We note that the government does not emphasize the "weird look” in its argument. Nor do we understand the district court to have given significant weight to the "weird look” in its analysis. In our view, Captain Roberts’s perception that through his look Robinson was saying, "[0]h, crap,” "I don’t want to lie to you, but I'm not going to tell you anything,” J.A. 89, was sufficiently subjective that it cannot constitute an objective or articulable factor supporting reasonable suspicion of dangerousness.

. We note that most of our cases assessing the relevance of a high-crime area involve nighttime police encounters, whereas the events at issue here transpired during the afternoon. Given our holding, we need not consider the effect of a daylight setting on any inferences that otherwise might be drawn from a high-crime location.