**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-4684**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ADONIS MARQUIS PERRY,

Defendant – Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Rebecca Beach Smith, Senior District Judge.  (2:18-cr-00113-RBS-DEM-1)

---

Argued:  October 27, 2023                           Decided:  February 6, 2024

---

Before GREGORY, RICHARDSON, and BENJAMIN, Circuit Judges.

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Gregory and Judge Benjamin joined.

---

**ARGUED:**  Patricia A. René, THE RENÉ LAW FIRM, Williamsburg, Virginia, for Appellant.  Daniel J. Honold, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Jessica D. Aber, United States Attorney, Richmond, Virginia, William B. Jackson, Assistant United States Attorney, Joseph E. DePadilla, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Adonis Perry was arrested in 2017 for possessing a firearm as a felon and for possessing marijuana after he was found with both during a traffic stop. While awaiting trial, he repeatedly tried to convince his girlfriend, one of the government's key witnesses, to refuse to cooperate. This led to four witness-tampering and obstruction-of-justice charges. A jury found Perry guilty on all counts. He now appeals, advancing seven challenges to his convictions and sentence. Finding no reversible error, we affirm.

## I.      BACKGROUND

### A.      Factual Background

#### 1.      *The December 18 Traffic Stop*

Perry first came to the police's attention around midnight on December 18, 2017. He and his girlfriend, Beatrice McCarr, were driving in the Huntersville neighborhood in Norfolk, Virginia—an area well-known for gang activity and violent crimes—in an SUV with no front license plate and a temporary paper license plate on the rear.[1] Officers Joshua Miller and Brian Para were on patrol in the same area and, after observing the unusual plate, decided to follow the vehicle. When the officers made a U-turn to investigate, the vehicle "tr[ied] to flee," accelerating away from the patrol car in an evasive manner and running two stop signs in the process. J.A. 278, 281.

The officers pursued, losing sight of the SUV for about ten seconds. When they caught up, the vehicle had pulled over in a parking lot and the passenger door was open.

---

[1] *See* Va. Code Ann. § 46.2-715 (2017) ("License plates assigned to a motor vehicle . . . shall be attached to the front and the rear of the vehicle.").

2

Officer Miller activated his patrol car's lights, which automatically turned on his dashboard camera. He then turned on his body camera. One feature of this camera is that it constantly keeps a thirty-second memory, even when it is not activated, allowing it to "go back 30 seconds in time from when [the officer] actually click[s] it on." J.A. 281. So even though Officer Miller had not turned on his camera during the initial encounter with the SUV on the road, his activation at the parking lot meant that the recording captured Perry and McCarr running the second stop sign. Miller then watched McCarr exit the driver's-side door. He also saw the person in the passenger's seat, Perry, briefly "lean[] towards the ground, the floorboard," before "jump[ing] over the center console" of the car to exit the driver's-side door as well. J.A. 283, 958.[2]

Because of the wide-open passenger door and furtive movements toward the floorboard, the officers ordered Perry and McCarr to show their hands before walking them back toward the patrol car. There, the officers handcuffed them before questioning the two individually. According to Officer Miller, the officers wanted to investigate "the license plate, why they appeared to be eluding [the police] and disregard[ing] two stop signs, the movement that we saw towards the floorboard, and why they both came out of the driver's side of the vehicle." J.A. 285–86.

---

[2] That McCarr was the first to exit the vehicle suggested to Officer Miller that she was driving the car and that Perry was the passenger. But Perry later told Officer Miller that he was the one driving and that he and McCarr quickly traded places during the ten seconds that the police lost them. If true, Perry would have been both the driver for the traffic infractions and the passenger who leaned toward the floorboard during the traffic stop.

3

Officer Miller took charge of investigating Perry, first asking for identification and running a background check. In response to questioning about the license plate, Perry said McCarr had all the necessary paperwork, implying that she owned the vehicle. Officer Miller then frisked Perry for weapons and had Perry sit in the back of the patrol car for the rest of the investigation (even though Perry was not yet under arrest). During the frisk, Officer Miller noticed something hanging out of Perry's back pocket. Perry permitted him to search the pocket, where Officer Miller found a blue bandana. The bandana, in addition to a notification from police dispatch that Perry had gang connections, led Officer Miller to believe that Perry was affiliated with the Crips gang.

Officer Para, who had been questioning McCarr, asked her for permission to search the SUV. She consented, and Officer Miller took Officer Para's place questioning McCarr while Officer Para began the search. McCarr told Officer Miller that she and Perry had no relation to the nearby apartment complex, which confirmed, in Officer Miller's mind, that their erratic driving was to evade the police. Officer Miller then returned to Perry. As he began to *Mirandize* Perry, Officer Para shouted that he found a revolver protruding from a purse on the passenger's-side floorboard. Officer Miller went over to the car, observed the revolver, and read McCarr the *Miranda* warnings. He then asked McCarr to talk. She agreed, telling him that the gun belonged to Perry. A few minutes later, Officer Para found another gun—a Glock with an extended magazine—on the passenger's-side floorboard. The officers discovered that the serial number for the Glock corresponded with a stolen gun, and McCarr said that this gun was also Perry's.

4

By this point, Officer Miller had learned from the background check that Perry was a felon. So he arrested Perry for being a felon in possession of a firearm and searched him incident to that arrest, discovering what Perry admitted was "weed." J.A. 303, 963. McCarr, on the other hand, was permitted to leave, taking the SUV and Perry's cell phone.[3]

### 2. *Perry's Pre-Trial Detention*

Perry remained detained during his pre-trial period. While detained, he often spoke to McCarr, who had his cell phone. He gave her the phone's passcode, and she used it for personal purposes and to communicate with Perry and his family. During at least one conversation, McCarr and Perry discussed the phone's contents, laughing over pictures of the two of them.

Many of their calls, however, were less light-hearted. During one conversation, Perry instructed McCarr and a third party, Juice, to draft a letter recanting McCarr's initial statements. After some reluctance from McCarr, Perry grew more insistent: "I just need you to do what I asked you to do. You understand me?" J.A. 1345. He told her that she would face no consequences for recanting and that doing so would cause the judge to release him.

The next day, Perry told McCarr to call the prosecutor directly, rather than send a letter, and confess that she had lied before. And in a later call, Perry and McCarr discussed

---

[3] Officer Miller preserved the bodycam video from this encounter but failed to preserve the dashcam video, which was automatically deleted thirty days after the stop. He concluded, after watching his bodycam video, that the bodycam and dashcam videos would have shown largely the same things and that the bodycam would have shown a better recording of that night's events. Officer Miller never reviewed the dashcam footage, however.

avoiding subpoenas, with Perry telling McCarr, "Listen, all you have to do is say, 'I never got subpoenaed. I don't live there.'" J.A. 1353. McCarr told Perry that she had done that, adding that the government messed up in "let[ting her] go" the night of Perry's arrest. J.A. 1353. During yet another call, McCarr told Perry that the police called her but that she pretended to be another person "because [she remembered] what [Perry] told [her] a long time ago." J.A. 1355. As she said, Perry "already gave [her] the rundown." J.A. 1359.

Perry didn't stop there. When he found out that federal agents had taken an interest in his case, he told McCarr, "[W]hatever you do, don't never . . . they want you to come back to court on me." J.A. 1360. And he mentioned the sentence he would face if convicted, prompting McCarr to say, "Well, just know I'm doing my part on my side." J.A. 1361. "They don't have nothing without you," Perry replied. *Id.* He also assured McCarr that she would face no legal penalties for not testifying, while the court or prosecutors would pin any blame for the guns on her if she testified.

Once Perry learned that McCarr had been subpoenaed, he pressed harder. Although McCarr was rightfully worried about the legal consequences of failing to appear, Perry told her not to worry, since "they can't give you failure to come to court, because . . . [t]hey cannot make you testify against nobody." J.A. 1376. He said that "if you do not show up at the next court date . . . they have to let me go." J.A. 1377. And he promised that the government could not "do anything to [her]." *Id.* He swore this "on [his] daddy," "on [their] dead child," and "on [his] kids' soul, every one of [his] kid's [sic] soul." *Id.* But when McCarr still seemed hesitant, Perry's pleas became desperate as he begged her to stay away from any proceedings. *See, e.g.,* J.A. 1378 ("They is waiting for you to come

6

here, man.  Please, man, please don't do it man.  Please, man.  Please, man.  On my kids, I swear to God, I never do that s[***], Beatrice.  Please don't do it, man.  Please.").

But McCarr decided to comply.  And when she returned to Virginia for the grand-jury proceedings, she brought Perry's phone, giving both it and the passcode to federal agents, along with her consent to search.  Although they obtained McCarr's consent, the federal officers still sought out a warrant to search the phone.  The magistrate refused to issue one, but he pointed the officers to *Casella v. Borders*, 404 F. App'x 800 (4th Cir. 2010) (unpublished), which they took as an indication that they did not need a warrant.  So they searched the phone, finding, most relevantly, pictures of Perry with the guns recovered at the traffic stop and text messages referencing the locations where the guns were found.  The metadata from the photos revealed that they were placed on the phone within a month of the December 18 traffic stop.

### B.      Procedural Background

In October 2019, a federal grand jury returned a second superseding indictment charging Perry with six counts.  Count One charged Perry with possessing a firearm as a felon from around October 21, 2017, to December 18, 2017.  18 U.S.C. §§ 922(g)(1), 924(a)(2).  Count Two charged witness tampering by attempting to influence, delay, and prevent testimony.  18 U.S.C. § 1512(b)(1).  Count Three charged witness tampering by attempting to induce a witness to evade legal process.  § 1512(b)(2)(C).  Count Four charged witness tampering by attempting to cause a witness to be absent from an official proceeding to which the witness had been summoned.  § 1512(b)(2)(D).  Count Five

charged obstruction of justice.  § 1512(c)(2).  And Count Six charged possession of a controlled substance.  21 U.S.C. § 844(a).

In the lead-up to trial, Perry burned through appointed attorneys at a remarkable rate.  The first *five* of Perry's lawyers all withdrew after he credibly threatened each one and, often, his or her family.  And Perry moved to have his sixth court-appointed counsel, Mr. Robinson, removed as well, arguing that Robinson had a conflict of interest because Perry threatened him in an unrelated 2016 state-court case.  Robinson, however, felt no conflict of interest and asserted that he could effectively represent Perry.  The court similarly found no conflict, permitting Robinson to remain as Perry's counsel.  As a precaution, however, the court appointed a seventh lawyer as Robinson's co-counsel.

With this arrangement, Perry proceeded to trial.  It lasted three days, at the end of which the jury returned a guilty verdict on all six counts.  Perry made a Rule 29 motion for judgment of acquittal, which the district court denied.  At sentencing, the Presentence Investigation Report initially calculated a Sentencing Guidelines range of 262–327 months' imprisonment.  Perry objected to various sentencing enhancements, two of which the court sustained, reducing Perry's recommended sentence to 168–210 months.  The court sentenced Perry to 210 months and three years of supervised release, denying the government's motion for an upward variance and the defense's motion for a downward variance.  Perry filed a timely notice of appeal.

## II.    DISCUSSION

### A.    The Traffic Stop

Perry's first argument is that he was unconstitutionally seized for much of the December 18 traffic stop. So he claims that the district court erred in refusing to suppress all the evidence that came from the stop as fruit of the poisonous tree. "In reviewing the denial of a motion to suppress, 'we review legal conclusions *de novo* and factual findings for clear error.'" *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021) (quoting *United States v. Seerden*, 916 F.3d 360, 365 (4th Cir. 2019)). "In conducting this review, the Court evaluates the evidence 'in the light most favorable to the government.'" *United States v. Runner*, 43 F.4th 417, 421 (4th Cir. 2022) (quoting *United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010)). We conclude that the seizure was constitutional.

The Fourth Amendment protects the right of the people to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Seizures of persons generally must be supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979). But probable cause is not an indispensable prerequisite. In *Terry v. Ohio*, the Supreme Court recognized that the police may constitutionally "conduct a brief, investigatory stop when [an] officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (discussing *Terry*, 392 U.S. 1 (1968)). This is an objective inquiry. Rather than focusing on the officer's "subjective frame of mind," we ask whether the facts known to the officer support an objective finding of "reasonable suspicion." *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008).

9

Either probable cause or reasonable suspicion may justify a traffic stop. *Berkemer v. McCarty*, 468 U.S. 420, 439 & n.29 (1984). But a traffic stop's duration cannot extend indefinitely. Instead, a stop's "mission" determines how long an officer may tolerably detain the subject of his investigation. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The police may not extend the stop beyond the scope of its initial mission without "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (quoting *Branch*, 537 F.3d at 336). So the validity of an officer's actions during a traffic stop often turns on whether those actions advanced the "mission" of the stop.

Here, the officers seized the vehicle and its occupants after finding the car stopped in the parking lot of an apartment complex with the passenger door open. At that point, the officers activated their blue lights and ordered the two occupants to show their hands and join them at the patrol car. Then, they handcuffed the occupants for officer safety. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a seizure occurs upon "*submission* to the assertion of authority"). This seizure was supported by both probable cause of observed traffic violations and reasonable suspicion of other criminal activity.

First, the district court reasonably found that the officers had observed the vehicle run two stop signs, which bodycam footage corroborated. This observation established probable cause that a traffic violation had occurred. *See United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." (quoting *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993))).

10

But the reason for the seizure was not so limited. The district court accepted that the officers perceived running the stop signs as unprovoked flight after the officers turned around to follow the SUV. And as the Supreme Court has explained, officers may stop individuals in a high-crime area who engage in "unprovoked flight upon noticing the police." *Wardlow*, 528 U.S. at 123–24.

In attempting to undercut *Wardlow*'s applicability, Perry treats the fact that he and McCarr ran two stop signs as any run-of-the-mill traffic infraction. That is, Perry argues that, since they were pulled over for traffic infractions, any investigation not directly related to those specific infractions was unreasonable. But this ignores important evidence that drove the mission of the seizure. McCarr and Perry weren't pulled over just for the traffic infractions. The officers testified, and the district court reasonably found, that when they made the U-turn to follow the SUV with a missing license plate, Perry and McCarr accelerated away. It was during this escape that they ran the two stop signs. Thus, the court found that Officer Miller witnessed McCarr and Perry engage in "unprovoked flight upon noticing the police," just like in *Wardlow*. *See* 528 U.S. at 123–24. Additionally, before ordering the two occupants to show their hands and walk to the patrol car, Officer Miller observed Perry crouched in the car's passenger seat with the door wide open before exiting the vehicle somewhat oddly by leaping over the center console to leave through the driver's-side door. *See United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013) ("A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon."). Under these circumstances, we conclude that Officer Miller had reasonable suspicion sufficient to justify detaining Perry.

11

Accordingly, the mission for the seizure was not, at any point, limited to the observed traffic violation (running two stop signs). The officers reasonably suspected[4] that criminal activity was afoot based on Perry and McCarr's reaction to the officers' U-turn. Investigating that activity was therefore part of the traffic stop's mission from the beginning. *See Rodriguez*, 575 U.S. at 354.

Even so, Perry challenges both the length of the stop and his detention during the stop. Neither was problematic.

First, under *Terry*, an individual's detention can "last no longer than necessary to verify or dispel the officer's suspicion." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) (quoting *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995)). So officers may constitutionally detain suspects until their suspicions should be reasonably verified or dispelled. But rather than alleviating the officers' suspicions, the initial detention revealed information to Officers Miller and Para that *heightened* their suspicions, such as Perry's furtive movements toward the floorboard and the fact that both he and McCarr exited out of the driver's-side door, even with the passenger's-side door wide open.

---

[4] At the end of his argument on the traffic stop, Perry makes the conclusory assertion that, despite Officer Miller's statements to the contrary, Perry was actually under arrest after he was handcuffed and placed in the patrol car. This would require probable cause, not reasonable suspicion. But he makes this assertion "without argument or explanation," *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017), citing no caselaw as to the legal standards governing when a *Terry* stop morphs into a custodial arrest. This "passing shot" at the issue is not enough to preserve it for appellate review. *Id.* (citation omitted). In failing to "develop [his] argument," Perry has forfeited it. *Id.* (citation omitted).

And that heightened suspicion led the officers to ask McCarr for consent to search the vehicle.

Perry argues that the officers deviated from the stop's mission in asking to search the car, making the search and prolonged seizure unreasonable. But once again, investigating suspicion of criminal activity was part of that mission. And as we have recognized, one purpose of a *Terry* stop is to allow the officer to "attempt[] to obtain [a person's] consent to a search when reasonable suspicion exists." *Leshuk*, 65 F.3d at 1110. This makes sense—if the point of the stop is to confirm or debunk suspicions, a search based on the suspect's consent is a reasonable (indeed, the least intrusive) way to do that. The search, therefore, advanced the traffic stop's mission of investigating suspected criminal activity. So the officers did not impermissibly extend the traffic stop either in asking for McCarr's consent to search or in searching the vehicle.

Second, the officers constitutionally detained Perry during the stop. The Supreme Court has long acknowledged the risks that unrestrained passengers can present to officers during traffic stops. *E.g.*, *Maryland v. Wilson*, 519 U.S. 408, 413 (1997). For this reason, officers may "attend to related safety concerns" during such stops. *Rodriguez*, 575 U.S. at 354. And this is not some minor, ancillary concern. Instead, the precautions that officers take to preserve their safety "stem[] from the mission of the stop itself." *Id.* at 356. Exercising their power to protect themselves, officers routinely detain passengers or limit their movements. *See Wilson*, 519 U.S. at 414–15; *Brendlin v. California*, 551 U.S. 249, 258 (2007) ("It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could

13

jeopardize his safety."). Just as the officers acted within the mission of the traffic stop by asking for consent and searching the car, they also acted within the mission of the stop by detaining Perry throughout the search.

The Constitution also permits officers to take reasonable steps to preserve their safety from any passengers they may have detained. *Cf. United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017). While Perry argues that the officers went overboard by handcuffing him, putting him in the patrol car, and running a background check, we have previously approved each of these practices. *See Elston*, 479 F.3d at 320; *Hill*, 852 F.3d. at 382. We have never recognized that taking one step to preserve officer safety during a *Terry* stop precludes others, and we decline to do so now.

For these reasons, we conclude that Perry's detention was constitutional and that the district court did not err in refusing to suppress the evidence from the stop.

### B.      The Cell Phone

Perry next contends that investigators violated his Fourth Amendment rights when they searched his cell phone with McCarr's consent. According to him, McCarr had neither actual nor apparent authority to grant such consent, meaning the police needed either *his* consent or a warrant. But McCarr had the requisite authority to consent to the search; so we affirm the district court's decision not to suppress the cell phone's contents.[5]

---

[5] The government asks us to hold that Perry had no reasonable expectation of privacy in his cell phone in light of *Casella*, 404 F. App'x at 802–04 (holding that an individual had no reasonable expectation of privacy in the contents of a cell phone once she relinquished physical control of it). In finding that McCarr had authority to consent, we see no need to address this question. We thus assume, but do not decide, that Perry had a reasonable expectation of privacy in his cell phone.

Just as the Fourth Amendment protects against unreasonable seizures, it also protects against unreasonable searches. U.S. Const. amend. IV. Consent makes a search reasonable, functioning as an exception to both the warrant and probable-cause requirements of the Fourth Amendment. *United States v. Matlock*, 415 U.S. 164, 165–66 (1974). Consent need not be obtained from the search's ultimate target. *Id.* at 171. Instead, consent from any person with "common authority over or other sufficient relationship to the . . . effects sought to be inspected" suffices. *Id.* That is, as long as the person who consents has "joint access or control for most purposes" over something, others with an interest in that effect will be seen to "have assumed the risk" that the consenter might submit the object to the police to be searched. *Id.* at 171 n.7.

The district court's reasonable factual findings show that McCarr had at least joint, if not sole, access and control over the cell phone at the time of the search. The court concluded that, for the seven months leading up to her decision to give the phone to federal agents, McCarr was the only person to use the cell phone. And she regularly used the phone for purely personal purposes. Furthermore, she had access to the contents of the entire phone. *Cf. Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) (noting that locked computer files to which the consenter *did not know the password* were not covered by consent). As such, she could go through the phone's photos, which she discussed with Perry during a recorded jail call. While Perry contends that he limited McCarr's authority to use the phone, he points to nothing in the record that supports his assertion. Indeed, his positive reaction to McCarr's admission that she was going through the phone's contents strongly undercuts his argument. Thus, we conclude that McCarr had actual authority to

15

consent to the phone's search, and the government's failure to get Perry's consent or a warrant is irrelevant.

Perry's last-ditch argument is that the government failed to establish that McCarr's consent was voluntary. The voluntariness of consent is a factual question that we review for clear error. *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002). And, contrary to Perry's assertion, a knowing waiver of the right to refuse is not the *sine qua non* of consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 246 (1973). Nothing in the record suggests that federal officials coerced McCarr in any way, so Perry cannot meet his burden of showing clear error. Indeed, Perry doesn't argue to the contrary. All he says is that "[i]t is unclear whether McCarr's consent was voluntary." Reply Br. at 14. But it is the appellant's burden "to demonstrate clear error in factual findings." *Zahn v. Nygaard*, 989 F.3d 1070, 1072 (8th Cir. 2021) (quoting *Griffin v. City of Omaha*, 785 F.2d 620, 626 (8th Cir. 1986)). Conclusory assertions unsupported by evidence do not suffice.

Accordingly, the district court did not err in refusing to suppress the contents of Perry's cell phone.

### C.    The Dashboard Camera

Perry's next argument is that the charges against him should have been dismissed because Officer Miller failed to preserve the dashcam footage from the traffic stop, depriving him of due process. "We review the district court's factual findings on a motion to dismiss an indictment for clear error, but we review its legal conclusions *de novo*." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (quoting *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir. 2005)).

16

Spoliation of evidence, or the destruction of or failure to preserve evidence, can be a due-process violation. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In order to rise to that level, however, the defendant must show that the unpreserved evidence had "an exculpatory value that was apparent before the evidence was destroyed[] and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). In addition, the defendant must establish that the police acted in "bad faith" in failing to preserve the evidence. *Youngblood*, 488 U.S. at 58. Thus, spoliation will only violate due process where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant" yet still failed to preserve it. *Id.*

Perry cannot satisfy even one of these elements. *Trombetta* makes clear that evidence will not have a constitutionally significant exculpatory value just because it "might conceivably" aid the defendant. 467 U.S. at 489. Instead, where "a dispassionate review" of the evidence "can only lead one to conclude that the chances are extremely low that the preserved [evidence] would have been exculpatory," failure to preserve "is without constitutional defect." *Id.* at 488–89. Here, Officer Miller and a dashboard-camera expert both testified that Officer Miller's bodycam captured the same, if not better, footage of the traffic stop. But the jury watched that video and found nothing exculpatory. "Dispassionate" consideration of the evidence thus negates Perry's bald assertion that the dashcam "would have answered . . . questions and aided Perry in his defense." Opening Br. at 40. Instead, the record suggests it would have "confirm[ed]" what the bodycam video already captured. *Trombetta*, 467 U.S. at 489. And the fact that the two videos were

17

duplicative also prevents Perry from arguing that "comparable evidence" was not reasonably available. *Id.*

Similarly, Perry cannot show bad faith. He argues that Officer Miller acted in bad faith because he failed to follow official policy on dashcam preservation. The government disputes the content of department policy, but this dispute is largely irrelevant. *Youngblood* says that bad faith requires that "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." 488 U.S. at 58. But Perry doesn't do that. And he doesn't try. Instead, Perry explicitly acknowledges that Officer Miller believed that it was unnecessary to preserve the dashcam because the stop was sufficiently captured by the bodycam. While he argues that this belief was unreasonable, that at most would show negligence, not bad faith. *Cf. Utah v. Strieff*, 579 U.S. 232, 241–42 (2016).

Perry has failed to show that Officer Miller did not preserve potentially exculpatory evidence in bad faith. Therefore, his due-process argument fails.

### D.    Sufficiency of the Evidence

Next, Perry asserts that the evidence supporting his convictions was insufficient. In reviewing the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We conclude here that there was substantial evidence supporting every charge and thus sustain the verdicts.

For the firearm charge, the officers witnessed Perry "reaching down in the passenger seat" just feet from where two firearms were eventually found. And McCarr testified that Perry owned both guns. She also testified that, earlier that day, Perry had pointed one of those guns at her and threatened to kill her. That evidence, plus the photos of Perry holding the firearms and his text messages discussing the location of the firearms before they were found, is sufficient for a reasonable jury to find Perry guilty beyond a reasonable doubt.

For the witness-tampering and obstruction charges, recorded phone calls document Perry telling McCarr to avoid legal process, to change her testimony, and to simply not show up to proceedings after being subpoenaed. Perry argues that those recordings only show that he was trying to convince McCarr to tell the "truth." Opening Br. at 47. Perhaps a jury could have agreed. But it is unclear why someone encouraging a witness to tell the truth would then tell the witness to avoid process and ignore a subpoena. And the jury was not required to accept what Perry called the "truth" as the actual truth, especially in light of McCarr's testimony that Perry's version was simply "not the truth." J.A. 1144. So that evidence was enough to sustain his convictions, too.

Finally, for the drug charge, Perry argues that the police lacked a chain of custody regarding the marijuana found during the search incident to arrest after the traffic stop. This objection was not raised at trial and is therefore reviewed for plain error. *See United States v. Collins*, 982 F.3d 236, 241 (4th Cir. 2020). To establish plain error, Perry "must show that an error (1) was made, (2) is plain (i.e., clear or obvious), and (3) affects substantial rights." *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010). And even if he makes this showing, we may only correct the error if it "seriously affects the fairness,

19

integrity[,] or public reputation of judicial proceedings." *Id.* at 577 (quoting *United States v. Massenburg*, 564 F.3d 337, 343 (4th Cir. 2009)).

Though Perry doesn't say so explicitly, his argument is essentially an authentication challenge. That is, absent a chain of custody, Perry argues that a reasonable jury could not find beyond a reasonable doubt that the drugs admitted were the drugs found on his person during the search incident to arrest. That would force, he contends, the district court to exclude the evidence under Federal Rule of Evidence 901. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").

Even if the prosecution did fail to establish a perfect chain of custody, which we need not decide, the district court did not plainly err in admitting the drugs. A chain of custody is not necessary for authentication under Rule 901. As we have repeatedly held, "[t]he 'chain of custody' rule is but a variation of the principle that real evidence must be authenticated prior to its admission into evidence." *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982); *see* Fed. R. Evid. 901(a). It is not an "iron-clad requirement" but permits the admission of evidence, even with a "missing link," where "the authentication testimony was sufficiently complete so as to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with." *Howard-Arias*, 679 F.2d at 366 (citation omitted). As long as the prosecution can establish to the satisfaction of the district court "that the item to be introduced, i.e.,

20

marijuana, is what it purports to be, i.e., marijuana seized from the [defendant]," there can be no Rule 901 or chain of custody objections. *Id.*

Here, the district court did not plainly err by admitting the drugs because ample evidence showed that the marijuana admitted at trial "[was] what it purport[ed] to be"— the marijuana seized from Perry. First, Officer Miller testified that the marijuana submitted at trial was the same "weed that was found" during the "search incident to arrest." J.A. 963. And second, Arthur Christy, a forensic scientist for the Virginia Department of Forensic Science, testified that the drugs submitted at trial were those marked with "the unique forensic science laboratory number for this case." J.A. 1045.

Because the district court did not plainly err in concluding that the marijuana admitted at trial was what it purported to be, we are left with the baseline question of whether the evidence submitted at trial was sufficient to support a conviction. The answer is yes. Along with the drugs themselves, the government presented to the jury Perry's own statements admitting that Miller found "weed" on him. J.A. 963. Though Perry now argues that his contemporaneous admission regarding the "weed" is different from admitting to possession of marijuana, that argument defies reality. *Cf. Weed*, Merriam-Webster's Collegiate Dictionary 1418 (11th ed. 2020). In light of that evidence, a rational trier of fact could conclude that Perry was guilty of the possession charge.

Because the government presented sufficient evidence for every crime charged, the district court did not err in refusing to grant a judgment of acquittal.

21

## E.    Double Jeopardy

Perry next argues that his obstruction and witness-tampering convictions violated the prohibition against placing a defendant in double jeopardy.  But Perry did not lodge this objection below; we thus review it for plain error.  *Collins*, 982 F.3d at 241.

The Double Jeopardy Clause of the Fifth Amendment states that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  This normally prevents multiple prosecutions for one offense, but the Supreme Court has interpreted the clause to also protect against "multiple punishments" for one offense.  *Jones v. Thomas*, 491 U.S. 376, 381 (1989).  Perry essentially argues that his obstruction and witness-tampering charges are the same offense and that he has thus faced multiple punishments.

But, contrary to Perry's claim, the fact that one act might lead to multiple charges does not itself violate the Double Jeopardy Clause.  *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("The applicable rule is that, where *the same act* or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (emphasis added)).  Instead, "[w]hen a single course of conduct violates multiple statutes, multiple punishments may be imposed without violating the Double Jeopardy Clause, if that is what Congress intended."  *United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008).  And we will presume that Congress intended multiple punishments when "the elements of each criminal statute 'do not overlap.'"

22

*United States v. Martin*, 523 F.3d 281, 291 (4th Cir. 2008) (quoting *United States v. Terry*, 86 F.3d 353, 356 (4th Cir. 1996)).

Here, none of the relevant offenses involve completely overlapping elements. Count Two required the government to show that Perry intended "to influence, delay, or prevent the testimony of Beatrice McCarr in an official proceeding or to cause or induce her to withhold testimony." J.A. 1294. Count Three required the government to show that Perry intended "to cause or induce Beatrice McCarr to evade legal process summoning her to appear in an official federal proceeding." J.A. 1298–99. Count Four required the government to show that Perry intended "to cause or induce Beatrice McCarr to be absent from an official federal proceeding to which she had been summoned by legal process." J.A. 1302. And Count Five required the government to show that Perry intentionally "obstructed, influenced, or impeded an official federal proceeding, or attempted to do so." J.A. 1306.

Without definitively deciding whether overlap might exist,[6] we cannot conclude that any potential error was "plain." Perry must show the error was "clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). And no authority from either the Supreme Court or this Court says that. In fact, we have held, in at least one unpublished case, that there is no double-jeopardy issue when a person is convicted of witness

---

[6] The three tampering charges seem to have an element that is not present in the others: Count Two required influencing, delaying, or preventing *testimony*, § 1512(b)(1); Count Three required causing the *evasion* of legal process, § 1512(b)(2)(C); Count Four required causing a person to be *absent* despite legal process having already been served, § 1512(b)(2)(D); and Count Five required corruptly obstructing, influencing, or impeding an official proceeding, § 1512(c)(2).

23

tampering under § 1512 and obstruction under § 1503 (an admittedly different statute than here). *See United States v. Neal*, 458 F. App'x 246, 248–49 (4th Cir. 2011) (unpublished). Without more definitive caselaw, we cannot conclude that any double-jeopardy error, if there was one, was plain.

### F.    Ineffective Assistance of Counsel

Perry also alleges that his counsel was constitutionally ineffective.  The Sixth Amendment right to counsel protects a criminal defendant's right to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  But "[c]laims of ineffective assistance of counsel may be raised on direct appeal only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010).  Perry's sole argument for ineffective assistance is that his lawyer had what Perry describes as a conflict of interest.  True, a conflict of interest can support a claim of ineffective assistance of counsel. *Mickens v. Taylor*, 535 U.S. 162, 174 (2002).  But to establish ineffective assistance in a case alleging a conflict of interest where no objection was raised at trial, Perry must show that his lawyer had "an actual conflict of interest" that "adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

"Conflict of interest," however, is not some catch-all term that encapsulates any friction in the attorney-client relationship.  Rather, it is a term of art, requiring the defendant to show that the lawyer "actively represented conflicting interests," *Woodfolk v. Maynard*, 857 F.3d 531, 553 (4th Cir. 2017) (quoting *Cuyler*, 446 U.S. at 350), beyond "a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171.  And absent a showing that

24

"counsel protested his inability simultaneously to represent" conflicting interests, the defendant must also show that "the conflict of interest adversely affected his counsel's performance." *Id.* at 173–74.

Perry fails to make this showing. He has not identified any other interest that his lawyer was representing during his trial. All he offers are unsupported and conclusory allegations that his lawyer could not adequately represent him because of Perry's own disrespectful and threatening treatment of the lawyer in a prior proceeding.[7] Yet Perry does not explain how this amounts to a legal "conflict of interest." Nor does he even address how the alleged conflict adversely affected his counsel's performance. Therefore, because his trial counsel's ineffective assistance is not conclusively established by the record, Perry has not established reversible error.

### G.    The Sentence

Finally, Perry argues that his sentence was substantively unreasonable. We review such claims for an abuse of discretion. *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017). Importantly, Perry concedes that his sentence was within the Sentencing Guidelines range. "A within-Guidelines range sentence is presumptively reasonable." *Id.* Thus, we must affirm unless Perry "raises any arguments that would rebut the presumption." *United States v. Susi*, 674 F.3d 278, 290 (4th Cir. 2012).

---

[7] Additionally, "[t]he district court is not compelled to substitute counsel when the defendant's own behavior creates a conflict." *United States v. Morsley*, 64 F.3d 907, 918 (4th Cir. 1995).

In attempting to rebut that presumption, Perry primarily argues that it is unreasonable to impose a sentence of 210 months when Perry was initially charged with a crime carrying a maximum penalty of 120 months. He maintains that the "facts of the case remain the same." Opening Br. at 54. But this ignores the pervasive pattern of witness tampering and obstruction between the December 18 traffic stop and trial. Those were the "additional charges" Perry implies were added simply as a method to "punish[]" Perry for "exercis[ing] his constitutional right to trial." *Id.* But imposing a greater punishment on a defendant who committed more crimes is not unreasonable.

Perry also argues that his "difficult life" warrants lenient punishment. Opening Br. at 55. The district court considered that argument and rejected it in light of Perry's recidivistic criminal history. That the district court did not grant Perry's background the sort of weight Perry would have liked does not establish an abuse of discretion. *See Susi*, 674 F.3d at 290.

Since Perry has shown nothing that amounts to an abuse of discretion, we affirm his sentence.

\*          \*          \*

On appeal, Perry argues that his Fourth Amendment, Fifth Amendment, Sixth Amendment, and due-process rights were all violated. But we conclude that no such violations occurred. Thus, we find no reversible error, and the district court's judgment is

*AFFIRMED.*