**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-4302**

———————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

HERBERT MURILLO-LOPEZ,

Defendant – Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T.S. Ellis, III, Retired District Judge. (1:22-cr-00180-TSE-1)

———————

Argued: September 27, 2024                    Decided: August 18, 2025

———————

Before DIAZ, Chief Judge, and HEYTENS and BENJAMIN, Circuit Judges.

———————

Affirmed by published opinion. Judge Heytens wrote the opinion, which Chief Judge Diaz joined. Judge Benjamin wrote an opinion concurring in part and dissenting in part.

———————

**ARGUED:** Ariel H. Bryant, Dallas, Texas, Ashley B. Eickhof, BAKER MCKENZIE LLP, Washington, D.C., for Appellant. Daniel J. Honold, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, Frances H. Pratt, Assistant Federal Public Defender, Valencia D. Roberts, Assistant Federal Public Defender, Ann Mason Rigby, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; William V. Roppolo, Annasofia A. Roig, BAKER MCKENZIE LLP, Miami, Florida, for Appellant.   Jessica D. Aber, United States Attorney, Richmond, Virginia, Ronald L. Walutes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

TOBY HEYTENS, Circuit Judge:

Herbert Murillo-Lopez was convicted of possessing a firearm while being an undocumented non-citizen, thus violating 18 U.S.C. § 922(g)(5)(A). He challenges the sufficiency of the evidence, the constitutionality of the stop and search that led to the firearm's discovery, and the constitutionality of the statute he was convicted of violating. We affirm.

I.

In August 2022, officers stopped a Ford Explorer at a gas station in Sterling, Virginia. Murillo-Lopez was in the driver's seat and, after a brief interaction, the officers recovered a firearm from a "cross-body satchel" "tightly affixed to" his body. JA 180.

A grand jury charged Murillo-Lopez with violating 18 U.S.C. § 922(g)(5)(A). Murillo-Lopez filed a pretrial motion to suppress the evidence from the traffic stop (including the firearm), which the district court denied. Five days before trial—and after the pretrial motions deadline had passed—Murillo-Lopez moved to dismiss the indictment, arguing Section 922(g)(5) is unconstitutional given *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). The district court denied that motion as well, deeming Murillo-Lopez's arguments "untimely" and "unpersuasive." JA 206–07.

After a trial, a jury found Murillo-Lopez guilty, and the district court denied his motion for a judgment of acquittal. The district court sentenced Murillo-Lopez to eight months of imprisonment, to be followed by three years of supervised release.

II.

We begin with Murillo-Lopez's challenge to the sufficiency of the evidence. If he "prevail[s] on this point," he is "entitled to a judgment of acquittal without further proceedings." *United States v. Gallagher*, 90 F.4th 182, 188 (4th Cir. 2024).

The only element of the crime whose sufficiency Murillo-Lopez disputes is knowledge that he was "illegally or unlawfully in the United States." 18 U.S.C. § 922(g)(5)(A); see *Rehaif v. United States*, 588 U.S. 225, 227 (2019) (Section 922(g) requires "that the defendant knew he . . . had the relevant status when he possessed" the firearm).[1] In conducting a sufficiency assessment, we "view the evidence in the light most favorable to the prosecution and assume the jury resolved all credibility disputes or judgment calls in the government's favor." *Gallagher*, 90 F.4th at 190 (quotation marks removed). We also "consider all the evidence considered by the jury"—including evidence that Murillo-Lopez asserts should have been suppressed. *Id.* at 189 (quotation marks removed). "We must uphold the jury's verdict if it is supported by substantial evidence, which means evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* at

---

[1] The government asserts Murillo-Lopez waived any such challenge during the sentencing hearing when his lawyer conceded Murillo-Lopez was "not denying that he knew as an adult that he was here illegally" as part of a successful effort to obtain an acceptance of responsibility credit. JA 602. This Court has never addressed whether counsel's statement during a sentencing hearing can waive a sufficiency challenge on appeal, and we leave that question unanswered today. Instead, we assume without deciding that Murillo-Lopez preserved his sufficiency challenge and reject it on the merits.

190 (quotation marks removed). Applying those standards, we conclude the evidence was sufficient to support the jury's verdict.

We start with the most obvious point in the government's favor: an officer testified that, during the stop, Murillo-Lopez admitted that "he wasn't a [United States] citizen" *and* that he "was illegal." JA 261–62; see JA 260. True, the jury could have discounted the officer's account and concluded that Murillo-Lopez only admitted to being a non-citizen while denying he was illegally present in the United States. But we must assume for these purposes that the jury credited the officer's testimony. See *Gallagher*, 90 F.4th at 190.

Still, Murillo-Lopez reminds us that a criminal conviction may not rest on "the uncorroborated admission or confession of the accused" and that some amount of "competent corroborative evidence" is required. *Wong Sun v. United States*, 371 U.S. 471, 488–90 (1963). But the government offered corroborative evidence too. When asked for his country of citizenship during a post-arrest interview with an immigration officer, Murillo-Lopez explained he was born in El Salvador and that both he and his parents were citizens of that country. During that same interview, Murillo-Lopez never claimed to be "lawfully present in the United States." JA 311. He also expressed no confusion when told he had been placed in removal proceedings, and he never offered to provide any form of identification or proof of lawful status. In addition, the immigration officer testified at trial that a search of Murillo-Lopez's fingerprints in government immigration databases revealed no record that he ever entered the country through a designated port of entry. Taken as a whole, this constitutes "substantial independent evidence" that "tend[s] to establish the trustworthiness of" Murillo-Lopez's on-the-scene admission that he knew he

was not legally present in the United States. *Opper v. United States*, 348 U.S. 84, 93 (1954); cf. *Greer v. United States*, 593 U.S. 503, 509 (2021) ("[A]bsent a reason to conclude otherwise, a jury will usually find that a defendant *knew* he was a felon based on the fact that he *was* a felon."). We thus reject Murillo-Lopez's sufficiency challenge.

III.

We turn next to Murillo-Lopez's Fourth Amendment challenges to the stop of the car and the search of his satchel. We conclude each fails.

Because the district court "denied a suppression motion, we must construe the evidence in the light most favorable to the government." *United States v. Vaughn*, 700 F.3d 705, 709 (4th Cir. 2012) (quotation marks removed). On the day of the stop, members of a joint federal-state task force sought to execute an arrest warrant on a man suspected of armed robbery. The officers had been told their target "was located at one of a few specific residences—all located on the same block," JA 179, and they had both a photo and a physical description of him. JA 83, 123. The officers also knew the target "was a member of MS-13" and "that members of MS-13 typically travel with other MS-13 members." JA 179.

Armed with that information, the officers began surveilling "a few addresses." JA 87. During their watch, the officers saw two or three men—"at least one of" whom "matched the description of the man who was the subject of the arrest warrant"—exit one of the surveilled residences, get into a Ford Explorer, and drive away. JA 179. The Explorer stopped at a 7-Eleven, where the men met with another group of men that had arrived in a sedan, bringing the total group size to five. The men went back and forth between the two

5

cars before splitting between them again. Eventually, the men drove to a nearby gas station, where officers stopped both cars.

A deputy United States Marshal approached the Explorer and saw Murillo-Lopez sitting in the driver's seat and another man in the back seat. The marshal had seen at least one photograph of the target, and he did not believe the picture "eliminate[d]" Murillo-Lopez "as the person" named in the warrant. JA 114. Indeed, Murillo-Lopez "matched the description of" the target—a Hispanic man with short black hair. JA 180. The marshal had a brief interaction with Murillo-Lopez and had already discovered the firearm when another officer "brought the fingerprint identification machine," JA 75, that confirmed the target was one of the men in the other car, not Murillo-Lopez.

### A.

Murillo-Lopez's first set of arguments involve the legality of the stop of the car he was driving. His primary contention is that the stop was unconstitutional because "[t]he record is devoid of evidence indicating that Mr. Murillo-Lopez was involved in criminal activity" at the time. Murillo-Lopez Br. 14–15.

As the government points out, that argument confuses the sufficient with the necessary. It is true the Fourth Amendment permits a "brief investigatory stop[ ]" of a vehicle where officers have reasonable suspicion "that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). But that is not the only basis on which an investigatory stop can be "reasonable" under the Fourth Amendment. Officers may also stop a person if they "have a reasonable suspicion . . . that a person they encounter . . . is wanted in connection with a completed felony."

6

*United States v. Hensley*, 469 U.S. 221, 229 (1985). And here it is undisputed that the officers sought "to execute an arrest warrant" when they stopped the cars. Murillo-Lopez Br. 2. In that situation, there is no additional requirement that officers also have reasonable suspicion of then-ongoing criminal activity. See *United States v. Holmes*, 376 F.3d 270, 276 n.2 (4th Cir. 2004) (describing officers as being "well within their rights" to stop a vehicle to investigate their reasonable suspicion that it contained two people with outstanding arrest warrants).

Murillo-Lopez responds he was not, in fact, the person named in the warrant, and he insists the officers lacked reasonable suspicion to think he was. We agree that officers may not stop people only because they "vaguely fit a suspect's description" or based on "a subjective hunch" that they might be a person named in a warrant. Murillo-Lopez Reply Br. 5, 10 (quotation marks and emphasis removed). Instead, officers need reasonable suspicion to initiate a stop to investigate whether a person they encounter is the same person named in a warrant. See *United States v. Hudson*, 405 F.3d 425, 438 (6th Cir. 2005). We conclude, however, that standard was satisfied here. See *Ornelas v. United States*, 517 U.S. 690, 691 (1996) ("[T]he ultimate question[] of reasonable suspicion . . . should be reviewed *de novo*.").

As the district court observed, officers only began surveilling "a few specific residences" after receiving uncontested information that a person wanted for armed robbery was there. JA 179. Equipped with a description and photograph of the target, officers then saw two or three men—at least one of whom fit the target's physical description—leave one of the homes under surveillance and drive off in the Ford Explorer that was eventually

7

stopped. Even as he approached the stopped car, the marshal believed—based on both a photograph and a physical description—that Murillo-Lopez may have been the person they were looking for.

Taken as a whole, those factors "eliminate a substantial portion of innocent travelers." *United States v. Brugal*, 209 F.3d 353, 359 (4th Cir. 2000). First, they exclude every person who an initial visual inspection could rule out as the person officers had seen in a photograph. More importantly, the factors present here exclude every person who neither walked out of one of a few addresses on a particular day nor rendezvoused with those people shortly after. This case is thus far different from those where officers stopped people based on vague (and often anonymous) physical descriptions in the general area of a suspected crime. Cf. *Milla v. Brown*, 109 F.4th 222, 229–30 (4th Cir. 2024) (stopped "close to" a gas station based on an unreliable and anonymous tip a crime had occurred there); *United States v. Massenburg*, 654 F.3d 480, 487–88 (4th Cir. 2011) (stopped four blocks from location of suspected criminal activity based on vague and anonymous tip). For that reason, we hold that the district court correctly rejected Murillo-Lopez's constitutional challenge to the stop.

## B.

We also reject Murillo-Lopez's challenge to the search that led to the discovery of the firearm. A search "conducted pursuant to consent" is constitutionally reasonable, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), and "[t]he voluntariness of consent is a factual question that we review for clear error," *United States v. Perry*, 92 F.4th 500,

8

513 (4th Cir. 2024). The district court found Murillo-Lopez consented to the search of his satchel, and that finding is not clearly erroneous.

Murillo-Lopez insists that he "was *unable* to consent in light of [a] language barrier," pointing to evidence he says shows he could not understand the officer's request to search his satchel. Murillo-Lopez Br. 31; see *id.* at 31–32. But the district court addressed that argument and found it "not supported by the record," noting Murillo-Lopez "heard, understood, and responded in English to questions asked only in English." JA 190–91. It is Murillo-Lopez's "burden to demonstrate clear error" in the district court's factual findings, *Perry*, 92 F.4th at 513 (quotation marks removed), and he fails to carry it.

## IV.

Murillo-Lopez's final argument is that the district court should have dismissed the indictment because the statute he was charged with violating itself violates the Second Amendment. Here too, we are unpersuaded.[2]

This Court has already rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(5), concluding undocumented non-citizens "do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives

---

[2] We once again deem it unnecessary to resolve a dispute about our standard of review. Federal Rule of Criminal Procedure 12(b)(3)(B)(v) says defendants must raise any defense that the indictment fails to state an offense via a timely pretrial motion. Murillo-Lopez admits he missed the relevant deadline but argues we should review his challenge de novo because he had "good cause" under Rule 12(c)(3) and the district court "reached the merits of the issue." Murillo-Lopez Br. 33. In contrast, the government insists the issue is either waived or reviewable only for plain error. We need not resolve these disputes because we conclude Murillo-Lopez's Second Amendment claim fails even under a de novo standard.

protection." *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012). True, that case was decided before *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024). But "[w]e do not lightly presume that the law of the circuit has been overturned, especially where, as here, the Supreme Court opinion[s] and our precedent can be read harmoniously." *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) (quotation marks removed).

This Court's decision in *Carpio-Leon*—which issued after the Supreme Court's groundbreaking decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)— conducted precisely the sort of textual and historical analysis that *Bruen* and *Rahimi* require. See *Carpio-Leon*, 701 F.3d at 978–82. *Carpio-Leon* also specifically declined to reach the second step of this Court's former approach to Second Amendment matters that *Bruen* later declared "one step too many." *Bruen*, 597 U.S. at 19 (rejecting the "means-end scrutiny" lower courts had often employed in "the Second Amendment context"); see *Carpio-Leon*, 701 F.3d at 982 (stating that the Court was not "proceeding to the second step" of the analysis set out in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)). We thus conclude that *Carpio-Leon*'s Second Amendment holding survives *Bruen* and *Rahimi*, and that we as a panel lack the power to depart from it. See *Bianchi v. Brown*, 111 F.4th 438, 448 (4th Cir. 2024) (en banc) (holding that *Bruen* "did not abrogate" a pre-*Bruen* decision that certain "covered assault weapons were outside the ambit of the individual right to keep and bear arms"); *United States v. Hunt*, 123 F.4th 697, 702–04 (4th Cir. 2024) (same about pre-*Bruen* precedent rejecting constitutional challenges to Section 922(g)(1)); *United States v. Sitladeen*, 64 F.4th 978, 985–86 (8th Cir. 2023) (same about pre-*Bruen*

10

precedent about Section 922(g)(5)(A)). For that reason, we reject Murillo-Lopez's Second

Amendment challenge as well.

*     *     *

The district court's judgment is

<em>AFFIRMED</em>.

DEANDREA GIST BENJAMIN, Circuit Judge, concurring in part and dissenting in part:

While I agree with the majority's conclusions on the sufficiency of the evidence and the constitutionality of 18 U.S.C. § 925(g)(5), I do not agree that Murillo-Lopez's challenge to the constitutionality of the stop is unsuccessful. Because the stop of the car does not satisfy the strictures of the Fourth Amendment, I respectfully dissent.

I.

Although the majority recounts some facts, additional context is necessary to paint a full picture.

A warrant task force consisting of state and federal law enforcement officers sought to execute a warrant for a member of MS-13, Jose Torres Cruz, for armed robbery. Members of the task force were advised that Cruz was in an "area of addresses" along the same block in Sterling, Virginia, and they conducted surveillance on these residences. Officers had a photo of Cruz and a general description of him: "a Hispanic male with short black hair." J.A. 114, 79–80. During their surveillance, officers observed two or three people leave one of the residences and drive away in a Ford Explorer registered to Murillo-Lopez's father. At that time, officers had no information about Murillo-Lopez, and the arresting officer, Deputy Marshal Tim Alley, had "not determined or verified that [Cruz] was actually among any of the individuals in either vehicle." J.A. 98:3–6. Officers followed the car to a nearby 7-Eleven, where the occupants of the Explorer met up with a second group in a Honda Accord. Officers then observed a total of five occupants going in and out of the store and back and forth between the two cars "with no real reason or

rhyme to [their movements]." J.A. 179, 88:22–89:19. At that time, officers did not know whether the occupants of the Accord were related to the occupants of the Explorer. J.A. 88:22–89:19. In fact, officers did not know the identities of any of the occupants. Instead, they only knew the license plate of the Explorer and the "area of addresses" associated with Cruz. J.A. 89.

Officers then followed the two cars for an hour and ten minutes, during which time they did not observe any illegal or suspicious activity. J.A. 85:5–23. Officers confirmed that the occupants of the Explorer were aware of the officers' presence during this time, and they made no attempt to flee or evade police. The cars eventually arrived at a Sunoco gas station, where officers confronted the occupants of both cars. Alley approached the Explorer and observed two occupants: Murillo-Lopez in the driver's seat, and a person sitting directly behind him. When Alley approached the car, he did not recognize Murillo-Lopez.

Upon approaching the car, Alley asked Murillo-Lopez and the passenger whether they had identification in both English and Spanish. Both responded "no." J.A. 180. Immediately thereafter, officers indicated the need for a Spanish interpreter. During his conversation, Alley asked whether the occupants were going fishing in English, accompanied by hand signals mimicking reeling in a fish with a fishing rod. Based on this conversation, Alley felt that he had developed a rapport with Murillo-Lopez. Alley described Murillo-Lopez as "very, very cooperative," "100 percent cooperative," and "100 percent compliant" throughout the interaction. J.A. 78:9–11, 96:23–97:5, 115:10–21. Alley testified that Murillo-Lopez "was calm, cool, he didn't get upset or anything. So

13

[Alley] didn't think he was armed at that point." J.A. 100:9–22. Alley also testified that he did not have any reason to believe that Murillo-Lopez was a member of MS-13. J.A. 97:9–11.

## II.

Although officers stopped Murillo-Lopez to execute a warrant, albeit for another person, the majority overstates the degree of certainty the officers had when approaching the car. In fact, at every step of the surveillance, the task force's suspicion that Cruz was among the group diminished.

## A.

The majority cites *United States v. Brugal*, 209 F.3d 353 (4th Cir. 2000), for the proposition that the factors in this case "eliminate a substantial portion of innocent travelers." Maj. Op. at 8 (citing *Brugal*, 209 F.3d at 359). *Brugal* notes that a reasonable suspicion determination is based on a "totality of the circumstances." 209 F.3d at 359 (citing *United States v. Sokolow*, 490 U.S. 1, 8 (1989)); *see also United States v. Hernandez-Mendez*, 626 F.3d 203, 207 (4th Cir. 2010) ("Courts assess reasonable suspicion by examining the totality of the circumstances."). Our examination of these circumstances must consider whether officers "had a 'particularized and objective basis for suspecting the person stopped of criminal activity.' " *Hernandez-Mendez*, 626 F.3d at 207–08 (first quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); and then citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002); and then citing *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997)). This is a "fact-intensive" inquiry that prohibits us from

14

considering individual facts and observations "in isolation from each other." *Id.* at 208 (citing *Arvizu*, 534 U.S. at 274–75).

Our review of reasonable suspicion may consider several factors, including, but not limited to, "whether a driver was excessively nervous during the stop," *United States v. Miller*, 54 F.4th 219, 229 (4th Cir. 2022) (citing *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018)); the context and circumstances surrounding a driver's trip, *see United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004); "a defendant's attempt to evade law enforcement," *United States v. Critchfield*, 81 F.4th 390, 394 (4th Cir. 2023) (collecting cases); and an officer's training and personal experience. *Hernandez-Mendez*, 626 F.3d at 209–10; *see, e.g., United States v. Massenburg*, 654 F.3d 480, 485–91 (4th Cir. 2011). "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008).

## B.

The district court identified three primary factors to support the officers' "reasonable, articulable suspicion that Jose Torres Cruz was in the Ford Explorer": (1) that Cruz was the target of an outstanding warrant and was identified as a member of MS-13; (2) that the Explorer left from a house in which Cruz was thought to reside; and (3) that the driver of the Explorer fit Cruz's description. J.A. 183–84. I address, and reject, the latter two in turn.

15

After surveilling *multiple* residences in an "area of addresses," officers observed two or three men leave a residence and enter a car that was registered to Murillo-Lopez's father. J.A. 85:21–23, 179. This is distinguishable from *United States v. Holmes*, 376 F.3d 270 (4th Cir. 2004), where officers had information that a suspect had arrived at a *specific* apartment complex in a *particular* car "fitting the description of that in which the gang was known to travel." *Id.* at 272, 276 n.2. Officers here surveilled multiple residences in an "area of addresses" and did not have any information about Murillo-Lopez or the car, other than the license plate. J.A. 89:21–24. That officers surveilled a general area undermines the district court's consideration that the Explorer left from a particular house in which Cruz was thought to reside. Thus, at the onset of the surveillance, officers were operating on a shaky foundation.

Next, with *no* confirmation that Cruz was among the men to leave the house, officers trailed the car for over an hour, during which they observed the occupants meet with another group of men and switch between cars "with no rhyme or reason." J.A. 85:5–23, 88:22–89:19, 98:7–14, 99:7–14, 179. Officers did not have any information about any of the men from either car, nor did they know the relation between the two cars. J.A. 63:15–22, 83:8–84:5, 86:20–24, 88:22–89:19. While following the cars, officers did not observe any suspicious or illegal activity, which is particularly notable given that the occupants of the Explorer knew they were being followed and made no attempt to evade police. J.A. 85:5–23; *see* Body Cam Footage at 00:40–00:50; *Critchfield*, 81 F.4th at 394 (collecting cases) (explaining that "a defendant's attempt to evade law enforcement can support reasonable suspicion"). These circumstances further undermine the officers' suspicion that

16

the target was among the group.  *See Hernandez-Mendez*, 626 F.3d at 208 (citing *Arvizu*, 534 U.S. at 274–75) (explaining totality of the circumstances).

Based on the photo of Cruz that Alley received before surveillance, he described Cruz as a "Hispanic male, black hair cut short."  J.A. 83:8–14, 108:19–109:2, 111:14–25, 112:20–21, 114:4–6, 123:16–21.  The district court repeatedly referred to this description and found that Murillo-Lopez's appearance in relation to the description supported a "reasonable articulable suspicion that Jose Torres Cruz was in the Ford Explorer."  J.A. 179–80, 184.  In doing so, the district court, and now the majority, ignore that this generic physical description could apply to many people in the predominantly Hispanic community of Sterling, Virginia.*  That "officers . . . saw two or three men—at least one of whom" fit this description, Maj. Op. at 7—in a predominantly Hispanic community exiting a general area of addresses even further undermines the officers' suspicion that Cruz was among the group.  Moreover, the occupants of the vehicles stopped twice during the surveillance, entered and exited stores, and switched between the two cars, giving the officers ample opportunities to determine that Cruz was not in the Explorer.

Finally, when Alley approached the car, Murillo-Lopez made no attempt to leave the scene, and was instead "very, very cooperative," "100 percent compliant," and "calm, [and] cool."  J.A. 78:9–11, 96:23–97:5, 100:9–22, 115:10–21; *see Miller*, 54 F.4th at 229 (4th Cir. 2022) (considering "whether a driver was excessively nervous during the stop"). During the conversation, Murillo-Lopez and the passenger explained to Alley that they had

---

* As of 2020, the Sterling, Virginia population was made up of 44.5% Hispanic people.  Census Dots, *Sterling, VA Demographics*, https://perma.cc/5GGQ-T5GF.

17

planned to go fishing. *See Foreman*, 369 F.3d at 785 (considering the circumstances and context of the trip). Alley also testified that he had no reason to believe that Murillo-Lopez was a member of MS-13 and nothing during their interaction led him to believe that Murillo-Lopez was personally armed and dangerous. J.A. 97:6–11, 100:5–22, 118:23–119:10, 120:17–20; *Hernandez-Mendez*, 626 F.3d at 209–10 (considering officer's personal experience).

The factors articulated here: a Hispanic male with short black hair exiting a residence in an "area of addresses," J.A. 89:21–24, without more, is insufficient to "eliminate a substantial portion of innocent travelers," as articulated in *Brugal*, 209 F.3d at 359, particularly in the context of Murillo-Lopez's community. Officers here approached Murillo-Lopez based on a general area and physical description, without having confirmed that Cruz was among the group to leave the house initially, and without having confirmed that Cruz was in the car, despite having multiple opportunities to do so. Considering the evidence presented to demonstrate reasonable suspicion as a whole, and in the context of the "totality of the circumstances," the officers' suspicion was not reasonable. *See Branch*, 537 F.3d at 337; *Hernandez-Mendez*, 626 F.3d at 208.

### III.

Taken together, these circumstances do not support a finding that officers approached Murillo-Lopez with the requisite particularized reasonable suspicion. For these reasons, I would reverse the district court's denial of Murillo-Lopez's motion to suppress.